DAVID ZARMI
California Bar No. 245636
8950 W Olympic Blvd., Ste. 533
Beverly Hills, CA 90211
310-841-6455
davidzarmi@gmail.com

*Attorney for Defendants*
*Centinela Skilled Nursing & Wellness Centre West, LLC*
*Brius Management Co.*

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| ERIC HOLLOWAY, deceased, by and through his legal representative and successor in interest, SHALIMAH ABDULLAH; and SHALIMAH ABDULLAH, individually,<br><br>　　　　　　Plaintiffs,<br>　　　vs.<br><br>CENTINELA SKILLED NURSING &WELLNESS CENTRE WEST, LLC dba CENTINELA SKILLED NURSING &WELLNESS CENTRE WEST, a California Skilled Nursing Facility; BRIUS MANAGEMENT CO., a California company; TAMAR RECHNITZ, an individual; and DOES 1-25, inclusive,<br><br>　　　　　　Defendants,<br><br>-and-<br><br>SAIDAH HOLLOWAY, an individual; AKBAR ABDULLAH, an individual; and RIHEIM HOLLOWAY, an individual,<br><br>　　　　　　Nominal Defendants. | Case No.<br><br>**NOTICE OF REMOVAL OF CIVIL ACTION**<br><br>**[Re: Los Angeles County Superior Court Case No. 21STCV17868]** |

COME NOW, Defendants CENTINELA SKILLED NURSING &WELLNESS CENTRE WEST, LLC and BRIUS MANAGEMENT, CO. ("Defendants"),[1] by and through their undersigned counsel, hereby remove this action from the Superior Court of the State of California, County of Los Angeles, to the United States District Court for the Central District of California, Western Division, reserving all defenses and reserving all objections to venue based on 42 U.S.C. § 247d-6d(e)(1), pursuant to 28 U.S.C. §§ 1441, 1442, and 1446, on the following grounds:

## I.  STATEMENT OF THE CASE

1.      This action was filed in the Superior Court of the County of Los Angeles, California as Case No. 21STCV17868 on May 12, 2021.  (Ex. A, Complaint.)

2.      Defendants were collectively served with the Summons and Complaint on June 28, 2021. (Ex. E, Proofs of Service.)  Accordingly, this Notice of Removal is timely.  *See* 28 U.S.C. § 1446(b); Fed. R. Civ. Proc. 6(a)(1).

3.      The Complaint asserts causes of action for alleged elder abuse (Cal. Welfare & Inst. Code § 15600), violation of resident's rights (Cal. Health & Safety Code § 1430(b)), negligence, and wrongful death resulting from alleged misconduct by a covered person in the administration of covered countermeasures under the Public Readiness and Emergency Preparedness Act ("PREP Act"), 42 U.S.C. §§ 247d-6d(d), 247d-6e.  (*See, e.g.*, Ex. A, Compl. at 10-11.)

4.      More specifically, Plaintiffs claim that Defendants engaged in negligent and/or willful misconduct in the care rendered to Decedent Eric Holloway during a period when both he and the facility were impacted by exposure, diagnosis, and treatment of COVID-19 and in the distribution, administration, or use of medical countermeasures, like segregation, social distancing, COVID-19 testing and personal protective equipment (PPE), to prevent the spread of COVID-19 within the skilled nursing facility (SNF) for the elderly known as Centinela Skilled Nursing &Wellness Centre West ("Centinela"), where Decedent resided.  (*See, e.g.*, Ex. A, Comp. at 10-11.)

---

[1] Although Plaintiffs have named as a defendant TAMAR RECHNITZ, Mrs. Rechnitz has not been served and is not part of the state court proceeding.

5.      The Complaint seeks damages including compensation for general damages, special damages, punitive damages, statutory damages, costs of suit, and attorney's fees.  (Ex. A, Compl. at 25-26.)

## II.      PROCEDURAL REQUIREMENTS

6.      This notice is filed on behalf of Defendants in the above-styled case pursuant to 28 U.S.C. § 1446(b)(2)(A).

7.      Concurrent with the filing of this Notice or promptly thereafter, Defendants are serving this Notice of Removal on all other parties pursuant to § 1446(d).

8.      Pursuant to § 1446(a), copies of pleadings and documents from the Superior Court for the County of Los Angeles served upon or provided to Defendants are attached as Exhibit A.

## III.      FEDERAL QUESTION JURISDICTION UNDER 28 U.S.C. § 1441(a)

9.      This case is removable under 28 U.S.C.A. § 1441(a) on the basis of original jurisdiction because Plaintiffs assert a claim arising under federal law withing the meaning of § 1331.

10.      On its face, the allegations contained in the Complaint reflect that a "covered person" was involved in "recommended activity" relative to a "covered countermeasure" and therefore presents a federal question under the PREP Act, 42 U.S.C. §§ 247d-6d, 247d-6e.

11.      As such, Congress provided an exclusive remedy for the substance of the allegations, and relief sought in the Complaint and Federal law expressly pre-empts state law for purposes of federal question jurisdiction.  §§ 247d-6d, 247d-6e.

12.      Federal courts have found "complete preemption" where a federal statute expressly preempts state law and creates an exclusive federal remedy for preempted state claims.  *See, e.g.*, *Fossen v. Blue Cross & Blue Shield of Mon., Inc.*, 660 F.3d 1102, 1107 (9th Cir. 2011); *In re WTC Disaster Site*, 414 F.3d 352, 380 (2d Cir. 2005); *Spear Marketing, Inc. v. Bancorp South Bank*, 791 F.3d 586 (5th Cir. 2015); *Nott v. Aetna U.S. Healthcare, Inc.*, 303 F.Supp.2d 565 (E.D. Pa. 2004).  Further, federal defenses that will be asserted by defendants are sufficient to invoke complete preemption.  *Jefferson Cty. v. Acker*, 527 U.S. 423, 431 (1999).

13.     Here, as set forth below, Defendants assert that the claims alleged in the Complaint and the defenses to them are completely preempted by the PREP Act sections found at §§ 247d-6d and 247d-6e.  *See Bruesewitz v. Wyeth LLC*, 562 U.S. 223, 253 (2011) (Sotomayor, J., dissenting) (where the majority found the National Childhood Vaccine Injury Act preempted state law, Justices Sotomayor & Ginsburg further analyzed that the PREP Act unequivocally demonstrated intent to completely preempt state law through its use of "categorical (e.g., 'all') and/or declarative language (e.g., 'shall')").

14.     Under § 247d-6d(a), a "covered person" is afforded broad immunity for all "claims for loss arising out of, relating to, or resulting from" the "administration" or "use" of a "covered countermeasure" as those terms are defined by that section, provided the Secretary of the Department of Health and Human Services (HHS) issues a declaration to that effect.

15.     For all claims barred by immunity under § 247d-6d that do not assert "willful misconduct," the exclusive remedy for relief is established under § 247d-6e, which permits an individual to make a claim for benefits through the Countermeasures Injury Compensation Program, also known as the Fund, for a "covered injury directly caused by the administration or use of a covered countermeasure."  In fact, and for purposes of illustrating Congress's intent to address all claims, even a claimant alleging "willful misconduct" must first apply for benefits through the Fund under § 247d-6e before bringing an action under § 247d-6d(d).  § 247d-6e(d)(1).  Further, even where a plaintiff has alleged willful misconduct and exhausted his remedies relative to the Fund, such plaintiff is limited to "*an exclusive Federal cause of action*" for willful misconduct "maintained only in the United States District Court for the District of Columbia."  § 247d-6d(d)-(e)(1) (emphasis added).

16.     Moreover, under § 247d-6d(b)(8), state law that "is different from, or in conflict with, any requirement applicable [for immunity]" is expressly preempted.

17.     Therefore, Congress has clearly manifested the intent to preempt state law with respect to claims or defenses that invoke PREP Act immunity and to create an exclusive federal remedy for such preempted claims, thereby "completely preempting" state law for purposes of federal question jurisdiction.  *See Bruesewitz*, 562 U.S. at 253.

18.     Here, as alleged in the Complaint, Defendants are "covered person[s]" in that Centinela is a SNF licensed by the State of California.  Further, Centinela, as well as its employees and affiliates are "covered persons" because each meet the requirements of a "program planner" of countermeasures under the PREP Act and are "qualified persons who prescribed, administered or dispensed" a countermeasure under the PREP Act.  This was confirmed by the Office of the General Counsel, HHS in an opinion letter dated August 14, 2020, stating that senior living communities administering covered countermeasures are "covered persons," entitled to immunity under the PREP Act by virtue of their status as both "program planners" and "qualified persons."  (Attached as Exhibit B.)

19.     Plaintiffs' claims "arise[] out of, relate[] to, or result[] from" the administration and use of a "covered countermeasure" obtained through a "means of distribution," to a "population," and within a "geographic area," or reasonably believed so by Defendants, for the purpose of treating, diagnosing, curing, preventing, or mitigating COVID-19, or the transmission of SARS-CoV-2 or a virus mutating therefrom, as such terms are defined within the PREP Act, §§ 247d-6d, 247d-6e, the Declaration under the Public Readiness and Emergency Preparedness Act for Medical Countermeasures against COVID-19, 85 Fed. Reg. 15198 (Mar. 17, 2020), amended by 85 Fed. Reg. 21012 (Apr. 15, 2020), and all corresponding amendments, regulations, and interpretational case law.

20.     At the time of the allegations set forth in the Complaint, and based on such allegations, Defendants were acting as "program planner[s]" that supervised the infection control policy program, under which FDA-approved personal protective equipment including, inter alia, N95 respirators, face shields, and gowns as well as diagnostic countermeasures were distributed and administered to Decedent and the Centinela staff in an effort to diagnose, mitigate, and prevent COVID-19, or the transmission of SARS-CoV-2 or a virus mutating therefrom.  Further, Centinela's employees and affiliates were acting as employees of "program planner[s]" that supervised and administered the infection control program that provided and used FDA-approved countermeasures on Decedent and the Centinela staff in an effort to diagnose and mitigate COVID-19, or the transmission of SARS-CoV-2 or a virus mutating therefrom.

21.     At the time of the allegations set forth in the Complaint, and based on such allegations, Centinela's employees and affiliates were acting as "qualified persons" because Centinela's employees were authorized to administer, deliver, and use FDA-covered countermeasures, like personal protective equipment and FDA-approved COVID-19 devices, medication, and diagnostic tests to diagnose and prevent COVID-19, or the transmission of SARS-CoV-2 or a virus mutating therefrom.

22.     At the time of the allegations set forth in the Complaint, and based on such allegations, Defendants were engaged in the management and operation of countermeasure programs in an effort to diagnose and prevent COVID-19, or the transmission of SARS-CoV-2 or a virus mutating therefrom to a "population" and within a "geographic area" specified by the Declaration under the PREP Act for Medical Countermeasures against COVID-19, 85 Fed. Reg. 15198 (Mar. 17, 2020), and all amendments thereto ("Declaration"), or reasonably believed so by Defendants.  Likewise, Centinela's employees and affiliates were physically providing the countermeasures to Decedent and using the countermeasures in an effort to diagnose and prevent COVID-19, or the transmission of SARS-CoV-2 or a virus mutating therefrom to a "population" and within a "geographic area" specified by the Declaration, and all amendments thereto, or reasonably believed so by Defendants.  The HHS Secretary confirmed the same in a guidance letter dated August 31, 2020 that diagnostic testing for COVID-19 in senior living communities qualifies as a "covered countermeasure" triggering PREP Act immunity.  (Attached as Exhibit C.)[2]

23.     At the time of the allegations set forth in the Complaint, the respirators and PPE used by Centinela were approved by the FDA as a qualified pandemic or epidemic product and were respiratory protective devices approved by the National Institute for Occupational Safety and Health under 42 CFR part 84, and were administered, delivered, distributed, and dispensed in accordance with the public health and medical response of the State of California or reasonably believed so by Defendants.  As

---

[2] Also available at https://www.hhs.gov/guidance/sites/default/files/hhs-guidance-documents/prep-act-coverage-for-screening-in-congregate-settings.pdf.

noted above, Plaintiffs' claims "arise[] out of, relate[] to, or result[] from" the administration and use of such "covered countermeasures."

24.     On January 8, 2021, HHS General Counsel issued new controlling authority (hereinafter "AO 21-01," attached as Exhibit D)[3] confirming unequivocally that: (1) the PREP Act is invoked by allegations like those in the Complaint, including alleged inaction or failure to act; (2) the PREP Act is a "'Complete Preemption' Statute" which confers federal question removal jurisdiction under 28 U.S.C. § 1441(a); and (3) as discussed in more detail below, federal jurisdiction is separately conferred in such cases under the doctrine articulated by the Supreme Court in *Grable & Sons Metal Prod., Inc. v. Darue Eng'g & Mfg.*, 545 U.S. 308 (2005), because "ordaining the metes and bounds of PREP Act protection in the context of a national health emergency necessarily means that the case belongs in federal court." (Emphasis added.)

25.     AO 21-01 unequivocally states that "[t]he PREP Act is a 'Complete Preemption' Statute," because it establishes both a federal and administrative cause of action as the only viable claim, and vests exclusive jurisdiction in federal court."  (Ex. D at 2.)

26.     AO 21-01 rejects the notion that immunity under the PREP Act requires actual "use" of a covered countermeasure. Specifically, AO 21-01 provides that "this 'black and white' view clashes with the plain language of the PREP Act, which extends immunity to anything 'relating to' the administration of a covered countermeasure."  (Ex. D at 3.)

27.     Specifically, AO 21-01 provides that "[p]rioritization or purposeful allocation of a Covered Countermeasure, particularly if done in accordance with a public health authority's directive, can fall within the PREP Act and this Declaration[']s liability protections.  There can potentially be other situations where a conscious decision ***not*** to use a covered countermeasure could relate to the administration of the countermeasure."  (Ex. D at 3, emphasis added.)  Thus, "program planners" fall

---

[3] Also available at https://www.hhs.gov/guidance/sites/default/files/hhs-guidance-documents/2101081078-jo-advisory-opinion-prep-act-complete-preemption-01-08-2021-final-hhs-web.pdf.

Notice of Removal of Civil Action

within the set of "covered persons" under the PREP Act and the "decision-making that leads to the *non-use* of covered countermeasures by certain individuals is the grist of program planning, and is expressly covered by PREP Act." (*Id.* at 4, emphasis added.)

28.    In the fourth amendment to the Declaration, the HHS Secretary expressly addressed *inaction*, as the Secretary defined "administration" of covered countermeasures to include not only physical use, but *non-use*, such as activities and decisions, as well as management and operation, of countermeasure programs generally. This distinction makes "explicit that there can be situations where *not administering* a covered countermeasure to a particular individual can fall within the PREP Act and this Declaration's liability protections." 85 Fed. Reg. 79190, 79194 (emphasis added) & 79197 (examples of such situations) (Dec. 9, 2020).

29.    Because Centinela and its employees are Covered Persons and because Plaintiffs' allegations concern Defendants' conscious decisions to use or not use covered countermeasures, including "implementing policies and procedures relating to infectious diseases" and PPE, the Complaint's claims and Defendants' defenses squarely fall within the PREP Act.

30.    As confirmed in AO 21-01, when the PREP Act is triggered, complete preemption attaches. Indeed, "[t]he *sine qua non* of a statute that completely preempts is that it establishes either a federal cause of action, administrative or judicial, as the only viable claim or vests exclusive jurisdiction in a federal court. The PREP Act does both." (Ex. D at 2.)

31.    AO 21-01 is binding on this court, as the HHS Secretary incorporated all HHS Advisory Opinions pertaining to COVID-19 into the PREP Act's implementing Declaration itself and proclaimed that the Declaration "must" be construed in accordance with them. 85 Fed. Reg. at 79191. As such, the HHS Advisory Opinions are no longer "advisory," as they now have the same "controlling weight" as the Declaration and the PREP Act itself. Where Congress has expressly delegated interpretative authority to an agency, that agency's interpretative proclamations are controlling on the federal courts. *Chevron, U.S.A., Inc. v. NRDC, Inc.*, 467 U.S. 837, 843-44 (1984). To avoid any doubt on this point, the Secretary amended the Declaration for a fifth time, confirming again in the Declaration itself that the

PREP Act is a complete preemption statute.  86 Fed. Reg. 7872, 7873-74 (Feb. 2, 2021).[4]  Congress has reinforced the Secretary's ultimate authority over these matters concerning the PREP Act, and warns that "[n]o court . . . shall have subject matter jurisdiction to review, whether by mandamus or otherwise, any action by the Secretary under [the PREP Act]."  42 U.S.C. § 247d-6d(b)(1), (4) & (7).  Thus, the federal courts must follow AO 21-01's controlling authority that the PREP Act is a complete preemption statute.

32.     AO 21-01 itself was preceded by other HHS authorities that have provided guidance to the courts in construing the PREP Act.  For example, Advisory Opinion 20-04 confirms that any individual or organization can potentially be a program planner and receive PREP Act coverage--"even grocery stores, universities, private businesses, places of worship, and private transportation providers."[5] And, as described above, HHS issued separate guidance letters specifically confirming that residential care facilities for the elderly are program planners or qualified persons under the PREP Act when they administer or use diagnostic testing and other covered countermeasures.  (*See* n.1, *ante*.)

33.     In a recent case with allegations similar to the instant one, and following a motion to remove from California state court, the court in *Garcia v. Welltower OpCo Group LLC*, 2021 U.S. Dist. LEXIS 25738 (C.D. Cal. Feb. 10, 2021) denied the plaintiff's motion to remand and granted the defendants' motion to dismiss.  The court there found that the plaintiff's allegations included the "use and misuse of PPE" and detailed "infection control measures and procedures including symptom checking, staff monitoring and screening, and limiting visitation."  (*Id.* at *8.)  Specifically, the court held: (1) "[t]he acts and omissions alleged by Plaintiffs appear almost verbatim in the January 8, 2021 Advisory Opinion" and, accordingly, the PREP Act applied to the plaintiffs' claims (*id.* at *14); (2) "because the OGC stated [in the January 8, 2021 Advisory Opinion] that the PREP Act is a complete preemption statute . . . an adequate basis for federal question jurisdiction exists" (*id.*); (3) prior federal

---

[4] Notably, this Fifth Amendment was done under the new Biden Administration, meaning that the HHS's interpretation of the PREP Act is nonpolitical.
[5] Available at https://www.hhs.gov/guidance/sites/default/files/hhs-guidance-documents/AO%204.2_Updated_FINAL_SIGNED_10.23.20.pdf.

opinions holding that the PREP Act did not provide a basis for federal question jurisdiction preceded more recent guidance from the OGC (Advisory Opinion published January 8, 2021), which established that "when a party attempts to comply with federal guidelines--in this case the COVID-19 pandemic-- the PREP Act would provide complete preemption" (*id.* at 10); and (4) "While the Court acknowledges that certain allegations relate to a failure to abide by local or federal health guidelines, these allegations related to momentary lapses.  Taken as true, all Plaintiffs' FAC discloses are possible unsuccessful attempts at compliance with federal or state guidelines--something which the PREP Act, the Declaration, and the January 8, 2021 Advisory Opinion cover."  (*Id.* at 14.)

34.     Furthermore, since the *Garcia* decision, the HHS Secretary amended the Declaration a sixth time, reaffirming, "The plain language of the PREP Act makes clear that there is preemption of state law as described above."  86 Fed. Reg. 9516, 9517 (Feb. 16, 2021);[6] *see generally Rachal v. Natchitoches Nursing & Rehab. Ctr., LLC*, 2021 U.S. Dist. LEXIS 105847, *4 n.3 (W.D. La. Apr. 30, 2021).

35.     Despite Plaintiffs' assertion of state law claims, because the PREP Act offers complete preemption, jurisdiction over the claims is exclusively federal.  *See Beneficial Nat. Bank v. Anderson,* 539 U.S. 1, 8 (2003) ("[w]hen the federal statute completely preempts the state-law cause of action, a claim which comes within the scope of that cause of action, even if pleaded in terms of state law, is in reality based on federal law").  Thus, under preemption doctrine alone, removal is proper under 28 U.S.C. § 1441(a).

36.     In addition to complete preemption, AO 21-01 confirms that the PREP Act confers separate, independent grounds for federal question jurisdiction under the *Grable* doctrine.  AO 21-01 highlights the Secretary's conclusion in the Declaration that "there are substantial federal legal and policy issues, and substantial federal legal and policy interests within the meaning of [the *Grable*

---

[6] *See* n.3, *ante*, regarding the nonpolitical nature of the HHS interpretation.

doctrine] in having a unified, whole-of-nation response to the COVID-19 pandemic among federal, state, local, and private sector entities."  (Ex. D at 5 (quoting 85 Fed. Reg. at 79197).)

37.     The Advisory Opinion's interpretation of *Grable* is consistent with the Supreme Court's long-standing rule "that in certain cases federal question jurisdiction will lie over state-law claims that implicate federal issues."  *Grable*, 545 U.S. at 312.  "The doctrine captures the commonsense notion that a federal court ought to be able to hear claims recognized under state law that nonetheless turn on substantial questions of federal law, and thus justify resort to the experience, solicitude, and hope of uniformity that a federal forum offers on federal issues."  *Id.*

38.     The *Grable* Court determined that no single, precise test exists for determining whether an embedded federal issue exists, but that, in general, a two-step process exists for determining whether a state law claim "arises under" federal law: (1) the state law claim must necessarily raise a stated federal issue that is actually disputed and substantial; and (2) federal courts must be able to entertain the state law claims "without disturbing a congressionally approved balance of state and federal judicial responsibilities."  *Grable*, 545 U.S. at 314.  Here, both prongs are satisfied.

39.     First, Plaintiffs bring a claim as a result of Defendants' alleged use or administration (or nonuse or non-administration) of covered countermeasures in connection with the care and treatment of the Decedent, which necessarily implicates disputed and substantial federal issues.  *See* 42 U.S.C. § 247d-6d.

40.     Second, as confirmed by the Advisory Opinion and the Declaration, the PREP Act expresses a clear intention to supersede and preempt state control of the very issues raised by Plaintiffs, i.e., issues concerning Defendants' decisions to use or not use covered countermeasures, including the use or non-use of PPE.  A substantial and disputed federal issue regarding the application of the PREP Act to Plaintiffs' claims therefore necessarily exists and must be resolved by this Court to ensure the uniform and appropriate application of the PREP Act.

41.     Courts have long recognized federal jurisdiction under the *Grable* doctrine.  *See, e.g.*, *McKay v. City & Cty. of San Francisco*, 2016 U.S. Dist. LEXIS 178436, *13-14 (N.D. Cal. Dec. 23,

2016) (finding federal jurisdiction under *Grable* where plaintiff's request that court enjoin use of flight paths was "tantamount" to a challenge to the validity of an FAA decision); *Bender v. Jordan*, 623 F.3d 1128, 1131 (D.C. Cir. 2010) (finding federal jurisdiction under *Grable* where breach of contract action arose under federal law because agreement was required by federal law and turned on interpretation of federal regulations).

42.     The two-step process is also satisfied where the alleged dispute "could have" supported the defendant's assertion of a federal declaratory judgment action.  *See Hollyvale Rental Holdings, LLC v. Baum*, 2018 U.S. Dist. LEXIS 56435, at *9 (D. Nev. Mar. 31, 2018) (*Grable* federal question jurisdiction existed under the "coercive action" doctrine where defendant "could have . . . brought a separate federal declaratory judgment action").

43.     The *Grable* doctrine and PREP Act are thus directly applicable to Plaintiffs' claims in any event and support this Court's jurisdiction.

## IV.     FEDERAL OFFICER JURISDICTION UNDER 28 U.S.C. § 1442(a)(1)

44.     This case is further removable under 28 U.S.C. § 1442(a)(1), which provides for removal when a defendant is sued for acts undertaken at the direction of a federal officer. "Unlike the general removal statute, the federal officer removal statute [Section 1442(a)] is to be 'broadly construed' in favor of a federal forum."  *In re Commonwealth's Motion to Appoint Counsel against or Directed to Def. Ass'n of Philadelphia*, 790 F.3d 457, 466 (3d Cir. 2015).  The case is removable pursuant to § 1442(a) because "(1) Defendants are 'persons' within the meaning of the statute; (2) the Plaintiffs' claims are based upon Defendants' conduct 'acting under' the United States, its agencies, or its officers; (3) the Plaintiffs' claims are 'for, or relating to' an act under color of federal office; and (4) Defendants raise a colorable federal defense to the Plaintiff's claims."  *Papp v. Fore-Kast Sales Co.*, 842 F.3d 805, 811 (3d Cir. 2016).  All requirements for removal under § 1442(a)(1) are satisfied here.

45.     The "acting under" requirement, like the federal removal statute overall, is to be "liberally construe[d]" to cover actions that involve "an effort to assist, or to help carry out, the federal supervisor's duties or tasks."  *Ruppel v. CBS Corp.*, 701 F.3d 1176, 1181 (7th Cir. 2012) (quoting *Watson v. Philip Morris Cos., Inc.*, 551 U.S. 142, 147 (2007)); *see In re Commonwealth*, 790 F.3d at

468.  To satisfy the second requirement, "a private person's actions 'must involve an effort to assist, or to help carry out, the duties or tasks of the federal superior.'"  *Watson*, 551 U.S. at 152.  Federal courts "have explicitly rejected the notion that a defendant could only be 'acting under' a federal officer if the complained-of conduct was done at the specific behest of the federal officer or agency."  *Papp,* 842 F.3d at 813.  Instead, a specific instruction from a federal officer or a detailed regulation to compel specific conduct satisfies the second requirement.  *See, e.g., Winters v. Diamond Shamrock Chem. Co.*, 149 F.3d. 387, 398-99 (5th Cir. 1998) (the federal government's specifications for the composition of Agent Orange conferred federal officer jurisdiction on the independent contractor); *Jane Doe v. UMPM*, 2:20-cv-00359 (W.D. Pa. July 31, 2020) (hospital's creation and enhancement of website to encourage its use to further goals of DHHH's push for shareable electronic medical records conferred federal officer jurisdiction; whether federal law preempts state law and whether a private entity's conduct was outside the scope of its federal duties "is the very thing that should be left to a federal court to decide").

46.    Here, Defendants, in taking steps to prevent the spread of COVID-19, did so in compliance with CDC and CMS directives, which were aimed at helping achieve the federal government's efforts at stopping or limiting the spread of COVID-19.  On March 10, 2020, CMS published a memorandum clarifying and amending policies and guidance in light of the CDC's expansion of the types of facemasks healthcare workers may use in situations involving COVID-19.[7]  In doing so, CMS acknowledged the federal government was taking "critical steps" to prepare health care facilities to respond to COVID-19 and acknowledged the need to "explore flexibilities and innovative approaches within our regulations to allow health care entities to meet the critical health needs of the country."  The memorandum issued on this date cites specifically to updated guidance from the CDC addressing the supply, allocation, and use of various items utilized to prevent the spread of infection and directly treat the virus.

47.    Furthermore, Defendants, in offering skilled nursing facilities and care, are subject to a high degree of federal regulation enacted to achieve the federal objective of allowing each resident in

---

[7] Centers for Medicare & Medicaid Services, Guidance for use of Certain Industrial Respirators by Health Care Personnel (March 10, 2020) (available at https://www.cms.gov/files/document/qso-20-17-all.pdf).

Notice of Removal of Civil Action

long term care facilities to "attain and maintain [] highest practicable physical, mental, and psychosocial well-being." § 1396r; *see* § 1395i-3; 42 C.F.R § 483. Providers of services seeking to participate in the Medicare or Medicaid program, or both, must enter into an agreement with the HHS Secretary or the state Medicaid agency, as appropriate. Long term care facilities seeking to be Medicare and Medicaid providers of services must be certified as meeting federal participation requirements. 81 FR 68688. The federal government has a stated objective to provide for the care of nursing home residents and created a mandatory federal regulatory framework to convert the private entities such as Centinela previously performing this service as federal officers or agents.

48.     The present COVID-19 pandemic resulted in several new regulations directives, guidance and requirements issued as a result of the Federal government acting through the regulatory framework of CMS and the CDC to convert nursing homes into frontline responders to the national COVID crisis. Indeed, the CDC acknowledged that current knowledge of the nature of the virus was evolving, and that these efforts were part of an "ongoing US public health response to identify and contain this outbreak and prevent sustained spread of 2019-nCov in the United States."[8] CMS directed infection control efforts and clarified CDC guidance to preserve scarce medical resources, including PPE, and maximizing the capacity of the healthcare system to navigate the spread of the pandemic. Further, CMS ordered facilities to restrict visitors, cancel communal activities, screen staff, amend policies regarding interaction with vendors, and handle potential end-of-life interactions with family members, among other interventions.[9] On April 2, 2020, CMS issued new guidelines aimed specifically to long-term care facilities to mitigate the spread of COVID-19, with the stated purpose of 'critical, needed leadership' and issuing "immediate" actions to "keep patients and residents safe."[10]

---

[8] Centers for Disease Control and Prevention, Update and Interim Guidance on Outbreak of 2019 Novel Coronavirus (February 1, 2020) (available at https://emergency.cdc.gov/han/HAN00427.asp).
[9] Centers for Medicare & Medicaid Services, Guidance for Infection Control and Prevention of Coronavirus Disease 2019 (COVID-19) in Nursing Homes (Revised) (March 13, 2020) (available at https://www.cms.gov/files/document/qso/20-14-nh-revised.pdf).
[10] Centers for Medicare & Medicaid Services, COVID-19 Long-Term Care Facility Guidance (April 2, 2020) (available at https://www.cms.gov/files/document/4220-covid-19-long-term-care-facility-guidance.pdf).

49.     Specifically, CMS directed long-term care facilities to "immediately" ensure compliance with "all CMC and CDC guidance related to infection control."  Again, CMS specifically referenced and referred facilities to updated and revised CDC guidelines.  CMS also implemented a number of actions to be undertaken immediately including 1) universal screening; 2) conservation of PPE; 3) proper PPE use; and 4) allocation of separate staffing, among other directives.  As has been previously stated, instructions were part of mandatory regulations imposed on long term care facilities by OBRA and regulations issued by CMS.  On April 19, 2020, CMS announced new regulatory requirements requiring nursing facilities to inform residents, families, and representatives of COVID-19 cases.[11]  Nursing homes were required to report COVID-19 cases and deaths directly to the CDC on an ongoing basis as the result of an unprecedented CMS regulatory requirement issued on May 1, 2020.  The Trump Administration implemented the new reporting requirement to develop a robust federal disease surveillance system to quickly identify problem areas and inform future infection control actions.  By law, CMS regulates and oversees nursing homes, which are certified to provide Medicare and/or Medicaid skilled nursing facility services.  This clearly demonstrates the fact that Defendants were acting at the direction of the federal government and as its agent in responding to COVID-19 response.

50.     Defendants, in following these directives, were engaged in an effort to assist, or to help carry out, the duties or tasks of CMS and the CDC in responding to the COVID-19 pandemic.  Defendants' actions and conduct were taken due to unprecedented and "strong government intervention" which went beyond the "mere auspices of federal direction."  *Fung v. Abex Corp.*, 816 F. Supp. 569, 572 (N. D. Cal. 1992).  CMS was controlling and reimbursing Defendants for actions taken in response to the COVID-19 pandemic and the President's proclamation declaring a national emergency concerning the novel COVID-19 outbreak on March 13, 2020.  Following the national emergency proclamation, rapid action was taken to waive restrictions and expand capacity for healthcare entities, providers, and

---

[11] Centers for Medicare & Medicaid Services, Press Release "Trump Administration Announces New Nursing Homes COVID-19 Transparency Effort" (April 19, 2020) (available at https://www.cms.gov/newsroom/press-releases/trumpadministration-announces-new-nursing-homes-covid-19-transparency-effort).

suppliers to coordinate a national response to the national emergency.  The national response effort converted Defendants into agents of the United States.

51.     Finally, Defendants satisfy the "nexus" or "causation" requirement for federal officer jurisdiction as the alleged conduct was undertaken "for or relating to" a federal office.  To meet this requirement, "it is sufficient for there to be a connection or association between the act in question and the federal office." *In re Commonwealth*, 790 F.3d at 471.  There is a clear causal nexus between the claims against Defendants and the actions taken by Defendants in responding to and administering care related to the COVID-19 outbreak.  As described above, the Complaint alleges deficiencies in Defendants' actions concerning infection control procedures taken in efforts to prevent the transmission and spread of COVID-19 while preserving resources to enable a nationwide response.  The nexus element is thus met by the various orders, guidelines, and recommendations followed by Defendants in addressing same.

52.     In addition, Defendants meet the requirement of the existence of a colorable federal defense as it intends to assert that immunity under the PREP Act applies to the present action.  For the purposes of removal, the defense must be "colorable" and need not be "clearly sustainable" as the purpose for the removal statute is to secure that the validity of the defense may be tried in federal court. *Willingham v. Morgan*, 395 U.S. 402, 407 (1969).  The Supreme Court explained that "one of the most important reasons for removal is to have the validity of the defense of official immunity tried in a federal court." *Acker*, 527 U.S. at 431.  For this reason, "we have rejected a narrow, grudging" approach when analyzing whether a defendant had raised a colorable federal defense. *Id.*  Based on the preemption argument alone, Defendants have a colorable defense under the PREP Act, and this element is satisfied.

53.     Removal is thus proper under federal officer jurisdiction in addition to federal question jurisdiction under the complete preemption exception and the *Grable* doctrine.

Notice of Removal of Civil Action

**WHEREFORE**, having shown that this case is properly removable on the basis of federal question jurisdiction and federal officer jurisdiction, Defendants provide notice pursuant to 28 U.S.C. § 1446 that the Action pending in Superior Court for the County of Los Angeles, California, case no. 21STCV17868, is removed to the United States District Court for the Central District of California, Western Division, and respectfully requests that this Court exercise jurisdiction over this case.

Respectfully submitted this twenty-eighth day of July, 2021.

**ZARMI LAW**

By: /s/  David Zarmi
8950 W Olympic Blvd., #533
Beverly Hills, CA 90211
310-841-6455
davidzarmi@gmail.com
*Attorney for Defendants*
*Centinela Skilled Nursing & Wellness Centre*
*West, LLC*
*Brius Management Co.*

## CERTIFICATE OF SERVICE

I hereby certify that on this twenty-eighth day of July, 2021, I will electronically file the foregoing with the Clerk of the Court using the CM/ECF system, which will then be sent Electronically to the registered participants as identified on the Notice of Electronic Filing and paper copies will be sent by first class mail to any counsel of record indicated as non-registered participants.

Dated: July 28, 2021

/s/ *David Zarmi*
*Attorney for Defendants*

*Attorneys for Plaintiffs*:

THE BARNES FIRM
Allen R. Oghassabian (SBN 292653)
Christian R. Oliver (SBN 313192)
655 W Broadway, Ste. 940
San Diego, CA 92101
Tel. 800-800-0000
allen.oghassabian@thebarnesfirm.com
christian.oliver@thebarnesfirm.com

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT A

Electronically FILED by Superior Court of California, County of Los Angeles on 05/12/2021 11:05 AM Sherri R. Carter, Executive Officer/Clerk of Court, by R. Perez,Deputy Clerk
21STCV17868

Assigned for all purposes to: Spring Street Courthouse, Judicial Officer: Daniel Crowley

1 ALLEN R. OGHASSABIAN, SBN 292653
  CHRISTIAN R. OLIVER, SBN 313192
2 **THE BARNES FIRM, LC**
  655 W. Broadway, Ste 940
3 San Diego, California 92101
  Tel: 800.800.0000  Fax: 888.800-7050
4 Email: allen.oghassabian@thebarnesfirm.com
  Email: christian.oliver@thebarnesfirm.com
5

6 Attorneys for Plaintiffs

7               **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

8          **COUNTY OF LOS ANGELES – CENTRAL JUDICIAL DISTRICT**

| | |
|---|---|
| 9  ERIC HOLLOWAY, deceased, by and through his personal legal representative and successor in interest, SHALIMAH ABDULLAH; SHALIMAH ABDULLAH, individually, | Case No.: 21STCV17868 |
| 11 | **COMPLAINT FOR DAMAGES:** |
| 12          Plaintiffs, | 1. **Elder Abuse and Neglect (Welf. & Inst. Code, §15600, et seq.)** |
| 13  v. | 2. **Violation of Patient Rights (Health & Safety Code §1430(b))** |
| 14  CENTINELA SKILLED NURSING & WELLNESS CENTRE WEST, LLC dba CENTINELA SKILLED NURSING & WELLNESS CENTRE WEST, a California Skilled Nursing Facility; BRIUS MANAGEMENT CO., a California company; TAMAR RECHNITZ, an individual; and DOES 1-25, inclusive, | 3. **Negligence** |
| | 4. **Wrongful Death** |
| 18          Defendants, | |
| 19  -and- | |
| 20  SAIDAH HOLLOWAY, an individual; AKBAR ABDULLAH, an individual; RIHEIM HOLLOWAY, an individual; | |
| 22          Nominal Defendants. | |

24          All allegations set forth in this Complaint are based on information and belief except

25 those allegations which pertain to Plaintiff(s) herein and their counsel. Each allegation in

26

27

28

*COMPLAINT*

1    this Complaint either has evidentiary support or is likely to have evidentiary support after

2    reasonable opportunity for further investigation and discovery.

3    **THE PARTIES**

4       1.     Plaintiff Decedent ERIC HOLLOWAY ("Decedent ERIC") was born on June

5    22, 1948 and died on April 19, 2020.

6       2.     Decedent ERIC was a victim of elder abuse and at all times relevant herein,

7    an "elder" or "dependent adult" as defined by Welfare & Institutions Code section

8    15610.23(b), and had physical limitations restricting his ability to carry out normal activities

9    and protect his rights as discussed more fully *infra*.

10       3.     At all times relevant to this action herein, Decedent ERIC was a resident of

11    the State of California, County of Los Angeles.

12       4.     PLAINTIFF SHALIMAH ABDULLAH ("SHALIMAH") is an adult individual, the

13    natural daughter of Decedent ERIC, and she brings the survival claims of Elder Abuse and

14    Neglect and Violation of Patient Rights on behalf of Decedent ERIC in her capacity as his

15    personal legal representative and Successor in Interest.

16       5.     Filed concurrently herewith is SHALIMAH's Declaration pursuant to Code of

17    Civil Procedure § 377.32.

18       6.     SHALIMAH is the surviving daughter of Decedent ERIC. She brings the

19    Wrongful Death action in her individual capacity as Decedent ERIC's heir.

20       7.     At all times relevant to this action herein, the Skilled Nursing Facility ("SNF")

21    known as the CENTINELA SKILLED NURSING & WELLNESS CENTRE WEST was

22    located at 950 South Flower Street, Inglewood, California 90301 in the county of Los

23    Angeles.

24       8.     Plaintiffs are informed and believe, and based upon information and belief

25    allege, that Defendant CENTINELA SKILLED NURSING & WELLNESS CENTRE WEST,

26    LLC, Defendant BRIUS MANAGEMENT CO., and Defendant TAMAR RECHNITZ, were

27

28

2

*COMPLAINT*

doing business as ("dba") CENTINELA SKILLED NURSING & WELLNESS CENTRE WEST ("Defendant FACILITY").

9.     Plaintiffs are informed and believe, and based upon information and belief allege, that at all times relevant herein, Defendant CENTINELA SKILLED NURSING & WELLNESS CENTRE WEST, LLC, Defendant BRIUS MANAGEMENT CO., and Defendant TAMAR RECHNITZ owned the Defendant FACILITY.

10.     Plaintiffs are informed and believe, and based upon information and belief allege, that at all times relevant herein, Defendants operated the Defendant FACILITY.

11.     Plaintiffs are informed and believe, and based upon information and belief allege, that at all times relevant herein, Defendant CENTINELA SKILLED NURSING & WELLNESS CENTRE WEST, LLC (hereinafter "CENTINELA (THE LICENSEE)") was the Licensee for the Defendant FACILITY.

12.     Plaintiffs are informed and believe, and based upon information and belief allege, that Defendant CENTINELA (THE LICENSEE), was at all times relevant herein, a California limited liability company.

13.     Plaintiffs are informed and believe, and based upon information and belief allege, that Defendant BRIUS MANAGEMENT CO., was at all times relevant herein, a California company.

14.     Plaintiffs are informed and believe, and based upon information and belief allege, that Defendant TAMAR RECHNTIZ, was at all times relevant herein, a resident of the State of California.

15.     Plaintiffs are informed and believe, and based upon information and belief allege, that Defendant CENTINELA (THE LICENSEE)'s principal executive office is located at 950 South Flower Street, Inglewood, California 90301.

16.     The Nominal Defendants are Decedent ERIC's heirs who, upon information and belief, have declined participating in the instant action and are named herein for

3

*COMPLAINT*

1 | service purposes only.

## JURISDICTION AND VENUE

17.     This Court has jurisdiction over the causes of action asserted pursuant to California Code of Civil Procedure § 410.10.

18.     The acts alleged in this complaint occurred in the County of Los Angeles.

19.     The Defendants, and each of them, have sufficient minimum contacts in California based on conducting business in California or otherwise intentionally avail themselves of the California market though their provision of services in the County of Contra Costa, so as to render them essentially at home in California and making the exercise of jurisdiction by the California courts consistent with traditional notions of fair play and substantial justice.

20.     Venue is proper in this Court pursuant to California Code of Civil Procedure §§ 395 and 395.5  based on the facts, without limitation, that this Court is a court of competent jurisdiction, that at least one Defendant either resides or does business in the County of Los Angeles, and because the injuries to the persons complained of herein occurred in the County of Los Angeles.

## BACKGROUND ALLEGATIONS

21.     Plaintiffs are informed and believe, and based upon information and belief allege, that a licensee is responsible for compliance with licensing requirements and the organization, management, operation, and control of the facility. The general duties of a licensee are set forth in Title 22 of the California Code of Regulations, § 72501. Certain duties are non-delegable including the responsibility for compliance with regulations and the management and control of the SNF. Delegation of authority by a licensee shall not diminish the responsibilities of the licensee. Therefore, even where a licensee delegates operational control to another person or entity, that licensee remains directly liable for management, operation, and control of the facility. (Cal. Code Regs., tit. 22, § 72501(a).)

4

*COMPLAINT*

22.     Plaintiffs are informed and believe, and based upon information and belief allege, that Defendants dba the Defendant FACILITY were subject to the requirements of federal and state laws and regulations that govern the operation of a SNF in California. In connection with its operation of the Defendant FACILITY, Defendants had a substantial and ongoing caretaking and custodial relationship involving ongoing responsibility for the basic needs of its residents, including Decedent ERIC.

23.     Plaintiffs are informed and believe, and based upon information and belief allege, by law, Defendant CENTINELA (THE LICENSEE) of SNFs operating in California must delegate to a designated administrator, in writing, the authority to organize and carry out the day-to-day functions of the SNF. During Decedent ERIC's admission to the Defendant FACILITY, the Defendant FACILITY had an Administrator, believed to be Mohsen Mobasser, who was responsible for the administration and management of the SNF in accordance with Title 22 of the California Code of Regulations § 72513. The Administrator was a managing agent of Defendant CENTINELA (THE LICENSEE) and had care of custody of Decedent ERIC.

24.     Plaintiffs are informed and believe, and based upon information and belief allege, Defendants, and each of them, had the duty to employ an adequate number of qualified personnel to carry out all of the functions of the SNF. (Health & Safety Code § 1599.1(a); Cal. Code Regs., tit. 22, § 72501, subd. (e)) Adequate staffing is essential to proper patient care and outcomes. There is no greater predictor of patient outcome in a skilled nursing facility than understaffing. The standard of care codified at 42 U.S.C. §§ 482.30 and 483.25 is to provide sufficient qualified nursing staff for nursing and related services to attain or maintain the highest practicable physical, mental, and psychosocial well-being of each resident, as determined by resident assessments, and plans of care. Because these requirements are codified in state and federal regulations, everyone involved in nursing home operations, including the owners, operators, managers,

5

*COMPLAINT*

1 | administrators, and directors of nursing in this case, understands the direct relationship
2 | between quality staff and patient outcomes.

3 | 25.   Plaintiffs are informed and believe, and based upon information and belief
4 | allege, in addition to Defendants' duty to have sufficient numbers of well-qualified and
5 | trained staff, Defendants had a duty to ensure that the Defendant FACILITY was operated
6 | in a way that respected and did not violate well-recognized resident rights under California
7 | Code of Regulations, title 22; Health and Safety Code section 1599.1; 42 U.S.C. §§ 1395-
8 | 1396; and 42 Code of Federal Regulations part 483.

9 | 26.   Plaintiffs are informed and believe, and based upon information and belief
10 | allege, the Defendant FACILITY, CENTINELA SKILLED NURSING & WELLNESS
11 | CENTRE WEST, LLC, and BRIUS MANAGEMENT CO. were under common ownership
12 | and control.

13 | 27.   Plaintiffs are informed and believe, and based upon information and belief
14 | allege, Defendant CENTINELA (THE LICENSEE) and Defendant BRIUS MANAGEMENT
15 | CO., and Defendant TAMAR RECHNITZ were responsible for ensuring the Defendant
16 | FACILITY was operated in full compliance with federal and state laws and regulations
17 | governing operations of a SNF, and for all aspects of the organization, management,
18 | operation, and control of the Defendant FACILITY.

19 | 28.   Plaintiffs are informed and believe, and based upon information and belief
20 | allege, Decedent ERIC's injuries arose out of the organization, management, operation
21 | and control of the Defendant FACILITY by Defendant CENTINELA (THE LICENSEE),
22 | Defendant BRIUS MANAGEMENT CO. and Defendant TAMAR RECHNITZ in their
23 | capacity as owner/operator of the Defendant FACILITY.

24 | 29.   Plaintiffs are informed and believe, and based upon information and belief
25 | allege, Defendants, each of them, share a joint responsibility for Decedent ERIC's injuries
26 | and death.

27 |

28 |

6

*COMPLAINT*

30.    Plaintiffs are informed and believe, and based upon information and belief allege, that at all times relevant herein, Defendants managed and controlled the Defendant FACILITY and made critical decisions regarding staffing budget and census, resulting in nurse staffing which fell below the legal minimum.   Defendant CENTINELA (THE LICENSEE) and Defendant BRIUS MANAGEMENT CO. and Defendant TAMAR RECHNITZ benefited financially from the policies and procedures, decisions, control, and management of the Defendant FACILITY in the form of income and profits received from the Defendant FACILITY.

31.    Plaintiffs are informed and believe, and based upon information and belief allege, that if Defendant CENTINELA (THE LICENSEE), BRIUS MANAGEMENT CO., Defendant TAMAR RECHNITZ, and Defendant FACILITY are not treated as a single enterprise or alter-egos of each other, a severe injustice will result. Allowing Defendant CENTINELA (THE LICENSEE), Defendant BRIUS MANAGEMENT CO., and Defendant TAMAR RECHNITZ to avoid legal responsibility for actions taken at the Defendant FACILITY level, which they directed and caused, would be unfair and unjust.

32.    Plaintiffs are informed and believe, and based upon information and belief allege, Defendants engaged in elder abuse and other wrongful conduct against Decedent ERIC.

32.    The true names and capacities, whether individual, corporate partnership, associate, or otherwise of Defendants named herein as DOES 1-25, inclusive, are unknown to Plaintiff, who therefore sue those Defendants by such fictitious names. Plaintiff will seek leave to amend this complaint to allege the true names and/or capacities and/or involvement of said fictitiously named Defendants when ascertained. Plaintiff is informed and believes, and thereon alleges, that each of the Defendants designated as a DOE is responsible in some manner for the events and happenings herein referred to and thereby legally caused the injuries and damages herein alleged.

*COMPLAINT*

33.     On information and belief, DOES 1 through 10 at all times mentioned herein owned, operated, managed, supervised, controlled, maintained, or were otherwise responsible for the business activities of Defendant FACILITY. Such DOES would include officers, directors, controlling shareholders, partners, and/or governing board members, persons in *de facto* control of healthcare, operators, and/or employees of Defendant FACILITY. At all times relevant to this action, DOES 1 through 10 helped set and enforce policies and procedures for the services rendered to clients of Defendant FACILITY.

34.     On information and belief, DOES 11 through 15 may be staff or contracted personnel of Defendant FACILITY, including physicians, licensed nurses, aides, social workers, business office personnel, and/or other clinical, or administrative personnel including, without limitation, persons directly or indirectly responsible for provision of patient care, persons having made representations or warranties to Plaintiffs, and/or persons acting in concert with other Defendants.

35.     On information and belief, DOES 16 through 25 include persons directly or indirectly responsible for provision of care to Decedent ERIC, including but not limited to physicians, medical groups, managed care organizations, acute care hospitals, home health agencies, visiting nurses, therapists, and/or other ancillary care providers who saw, examined, evaluated, observed and/or treated or failed to treat Decedent ERIC  leading to injury or death and/or persons having made representations or warranties to or from the Department of Social Services, the Department of Public Health, the Long Term Care Ombudsman, Adult Protective Services, Defendant FACILITY, and/or anyone purporting to act on behalf of or in concert with these persons or entities. The identities of such persons or entities are unknown to Plaintiff and Plaintiff will seek leave to amend when those identities are ascertained. Plaintiff is informed and believes, and thereon alleges, that each of the Defendants designated as a DOE is responsible in some manner for the

8

1  events and happenings herein referred to and thereby legally caused the injuries and
2  damages herein alleged.

3       36.     Upon information and belief, Plaintiff further alleges that each Defendant and
4  DOES 1-25 were the agent, servant, employee, joint venturer, and/or partner of each Co-
5  Defendant, and at all times acted within the course and scope of said agency, employment,
6  venture, and/or partnership pursuant to the policies, practices, procedures, written or
7  otherwise, and with the advance knowledge, acquiescence, or subsequent ratification of
8  each Co-Defendant.

9       37.     Upon information and belief, Plaintiff further alleges that each Defendant and
10  DOES 1-25 are liable for the acts of each other through principals and/or respondent
11  superior, agency, ostensible agency, partnership, alter-ego and/or other form(s) of
12  vicarious liability. Consequently, each Defendant is jointly and severally liable to Plaintiffs
13  for damages sustained as a proximate result of his, her, or their conduct.

14       38.     Decedent ERIC was admitted to Defendant FACILITY in January of 2020 for
15  short-term care. He required skilled and custodial services to meet his care needs.

16       39.     Decedent ERIC had a history of hypertensive heart disease with heart failure,
17  pneumonia, chronic obstructive pulmonary disease with acute exacerbation,
18  atherosclerosis of bypass graft of coronary artery of transplanted heart with unstable
19  angina, atrial fibrillation, and muscle weakness generalized. Additionally, he was labeled a
20  fall risk. As a result of his physical and mental condition, he was dependent on others for
21  his activities of daily living including, but not limited to, personal hygiene, transferring in
22  and out of bed, eating, drinking, and managing medication.

23       40.     Defendants failed to properly assess and gather information to make
24  decisions about suitable interventions to avoid individualized health risks. The care plan
25  must set goals to provide benchmarks for evaluating whether the planned care
26  interventions are effective. The staff must assess and reassess the resident to determine
27
28

9

**COMPLAINT**

1   whether the care plan goals are being met.  If the interventions are not working, the care

2   plan must be modified to include alternative treatment interventions.  If the resident has a

3   change of condition, he or she must be reassessed to determine if the care plan needs to

4   be modified as a result of the resident's new condition and/or baseline. Care planning is an

5   ongoing interdisciplinary process that is critical to patient outcomes.

6          41.    Decedent ERIC had a history of pneumonia, putting him at risk for developing

7   pneumonia or other respiratory infections/syndrome.

8          42.    Defendants knew, or should have known, that prevention and care is

9   especially important among nursing home residents such as Decedent ERIC, who are

10   more susceptible to illness due to their age, and medical conditions.

11          43.    However, Defendant FACILITY failed to provide adequate care to Decedent

12   ERIC and failed to effectively develop, implement, and modify care plans for his

13   individualized care needs.

14          44.    Decedent ERIC was labeled a fall risk. Yet the records documented by

15   Centinela Skilled Nursing & Wellness Centre West reflect that Defendants failed to provide

16   the full assistance he required.

17          45.    During Decedent ERIC's stay at Defendant FACILITY, his daughter video

18   called and voice called him often to check on him.

19          46.    Sometime during the early spring of 2020, Defendant FACILITY no longer

20   allowed visitors in the facility.

21          47.    In or around March of 2020, it was reported that approximately 27 cases of

22   COVID-19 have been confirmed at Defendants' FACILITY.   Defendant FACILITY

23   employees began to fail to show up for work.  Defendant FACILITY failed to provide

24   required care to the facility's residents and placed them in harm's way.

25          50.    On April 17, 2020, Decedent ERIC tested positive for COVID-19.

26

27

28

**COMPLAINT**

51. On April 19, 2020, Decedent ERIC was transported to Centinela Hospital after suffering a fall which resulted in a laceration on his face. Upon admission to the emergency room, Decedent ERIC was found have shortness of breath, acute respiratory failure, congestive heart failure, sepsis, basilar loss, pneumonia, and bandemia.

52. Over the next few days, Decedent ERIC's health continued to decline.

53. Unsurprisingly, Decedent ERIC's health continued to deteriorate. The hospital administered intubation and medication. However, he could not recover and died on April 19, 2020.

## FIRST CAUSE OF ACTION

## ELDER ABUSE AND NEGLECT

### [Welfare & Institution Code §§ 15600, et seq.]

### (Against Defendants CENTINELA SKILLED NURSING & WELLNESS CENTRE WEST, LLC dba CENTINELA SKILLED NURSING & WELLNESS CENTRE WEST, BRIUS MANAGEMENT CO., TAMAR RECHNITZ, and DOES 1-25)

54. Plaintiffs hereby incorporates by reference Paragraph 1 through 53 of this Complaint as though fully set forth herein.

55. Decedent ERIC, at all times relevant herein, was over the age of 65 and thus an "elder" as that term is defined in Welfare and Institutions Code § 15610.27.

56. Decedent ERIC was not able-bodied and was unable to take care of his own needs during the time he was under the care and custody of Defendants, while a resident of Defendant FACILITY. Decedent ERIC had hypertensive heart disease with heart failure, pneumonia, chronic obstructive pulmonary disease with acute exacerbation, atherosclerosis of bypass graft of coronary artery of transplanted heart with unstable angina, atrial fibrillation, and muscle weakness generalized. He was, thus, dependent on Defendants' care staff for all his activities of daily living including assistance in dressing, grooming, bathing, toileting, medication management, and feeding.

11

*COMPLAINT*

57.     Accordingly, Defendants and each of them, had a substantial ongoing caretaking and custodial relationship with Decedent ERIC, while he was a resident at the Defendants' FACILITY.  Decedent ERIC was dependent on Defendants, and each of them, for all of his custodial and other care needs.

58.     Each resident of Defendants' FACILITY is an elder and/or dependent adult as defined by Welfare & Institutions Code sections 15610.23 and 15610.27, respectively. Defendants knew or should have known that their conduct, as described herein, was directed to one or more elder and/or dependent adults. Because of his age, condition, restricted mobility, and disability, Decedent ERIC was substantially more vulnerable to the conduct of Defendants than other members of the public.

59.     Defendants had a duty to Decedent ERIC to provide access to care and treatment to prevent the development of wounds, infection/syndrome, pain, malnutrition, and dehydration; to ensure medical care that was needed was actually provided; and to accept and retain only those residents for whom it could provide adequate care, supervision, and assistance. Because Defendant FACILITY accepted and retained Decedent ERIC as a resident, they owed a duty to Decedent ERIC to act reasonably in the discharge of their duties and to not willfully or recklessly ignore Decedent ERIC's medical care needs or cause unnecessary suffering. Without limiting the foregoing, Defendants owed the following duties to Decedent ERIC:

a.     Duty to identify individualized care needs based on assessment of patient's needs with input from patient and, if necessary, health professionals involved in the care of the patient (Cal. Code Regs., tit. 22, § 72311(a)(1)(A)); 42 C.F.R. §§ 483.10(f), 483.20(b)(1); 42 U.S.C. § 1395i-3(b)(3));

b.     Duty to provide care as implemented by individualized written patient care plan indicating the care to be given, objectives to be

12

**COMPLAINT**

accomplished, and the professional discipline responsible for each element of care (Cal. Code Regs., tit. 22, § 72311(a)(1)(B); 42 C.F.R. § 483.10(c));

c. Duty to review, evaluate, and update patient care plans as necessary and more often if there is a change of the patient's condition (Cal. Code Regs., tit. 22, § 72311(a)(1)(C));

d. Duty to provide care as implemented by the patient care plan according to the methods indicated (Cal. Code Regs., tit. 22, § 72311(a)(2); 42 U.S.C. § 1395i-3(b)(4));

e. Duty to provide care pursuant to physician's orders in the administration of medication and/or treatment, to provide medication and treatment as prescribed, and prepare a record of the administration of medication and treatment (Cal. Code 17 of Regs., tit. 22, §§ 72313 (a)(1)-(2) and (c));

f. Duty to record nurses' notes that are clear and legible, dated and signed, among other qualifications, including narratives or how a patient responds, eats, drinks, looks, feels, and reacts (Cal. Code Regs., tit. 22, § 72547(a)(5));

g. Duty to provide the resident or responsible party with the opportunity to participate in an immediate and ongoing basis in the total plan of care including identification of medical, nursing, and psychosocial needs and the planning of related services (Cal. Code Regs., tit. 22, § 72527(a)(3); 42 C.F.R. § 483.10(c));

h. Duty to provide care in such a manner and in such an environment by facility staff to be free from mental and physical abuse and neglect (Cal. Code Regs., tit. 22, § 72527(a)(10); 42 C.F.R. § 483.12;

13

i.   Duty to provide care in such a manner and in such an environment to prevent formation and progression of pressure ulcers including turning and repositioning; using pressure-reducing devices where indicated; provide care to maintain clean, dry skin free of feces and urine; and carry out physician orders for treatment of ulcers (Cal. Code Regs., tit. 22, § 72315(f); Health & Saf. Code, § 1599.1(b));

j.   Duty to provide adequate personal hygiene, nutrition, and fluids to prevent malnutrition, dehydration, and promote wound healing (Cal. Code of Regs., tit. 22, §§ 72315(d)(g)(h); Health & Saf. Code, § 1599.1(b));

k.   Duty to provide adequate number of qualified personnel to carry out all functions of the facility and to meet patients' needs as well as adequate training and competent supervision (Cal. Code of Regs., tit. 22, §§ 72329 and 72329.1; Health & Saf. Code, § 1599.1(a); 42 C.F.R. §§ 483.35, 483.95).

l.   Duty to treat residents with consideration, respect, and full recognition of dignity (Cal. Code Regs., tit. 22, § 72527(a)(12)); and,

m.   Duty to notify physician of any change of condition and to note all attempts to notify physician in patient's health record (Cal. Code Regs., tit. 22, § 72311(a)(3) and (b)).

60.   In addition, and without limiting the generality of the foregoing, Defendants owed the following duties to Decedent ERIC and committed elder neglect by: failing to implement policies and procedures to ensure resident care needs are met; failing to provide training on the policies and procedures to ensure resident care needs are met; failing to ensure physician care is provided; failing to plan a budget whereby staffing levels are adequate; failing to allocate sufficient resources to staff Defendant FACILITY in both

14

1  quantity and quality caregivers; and failing to comply with state and federal laws and
2  regulations pertaining to SNFs.

3       61.    Defendants conduct further constitutes neglect as that term is defined in
4  Welfare and Institutions Code § 15610.57 to include "the negligent failure of any person
5  having the care or custody of an elder or a dependent adult to exercise that degree of care
6  that a reasonable person in a like position would exercise, including but not limited to:

7             a.  Failure to assist in personal hygiene, or in the provision of food, clothing,
8                 or shelter.

9             b.  Failure to provide medical care for physical and mental health needs;

10             c.  Failure to protect from health and safety hazards;

11             d.  Failure to prevent malnutrition or dehydration.

12       62.    Pursuant to California law, Defendants are required to provide an elder, such
13  as Decedent ERIC, "basic services" including, a duty to continually assess Decedent ERIC's
14  condition, a duty to note changes in Decedent ERIC's condition, and a duty to immediately
15  notify Decedent ERIC's physician and family of changes.  Defendants similarly had a duty
16  to create and update adequate plans of care, and to receive, note, and follow physicians'
17  orders. Defendants had a duty to treat Decedent ERIC with dignity and respect, and to
18  provide adequate numbers of nursing and other similar staff to assist him. Defendants had
19  a duty to employ adequately trained staff. Yet Defendants failed to provide medical care
20  and custodial care sufficient to meet Decedent ERIC's physical and mental health needs
21  and failed to protect her from health and safety hazards, as described in detail herein.

22       63.    Defendants, knew that Decedent ERIC was an elder who required assistance
23  to meet his basic needs, yet failed to provide for those needs, even with knowledge of
24  Decedent ERIC's high risk for injury, his dependence on Defendants, and the substantial
25  certainty that Decedent ERIC would be injured if these needs were not provided for.
26  Defendants' failure to provide Decedent ERIC with the care, assistance, and monitoring that

27

28

**COMPLAINT**

1 | he required caused him harm.

2 |      64.    Defendants denied and withheld basic care to Decedent ERIC despite the

3 | knowledge that by doing so, injury was substantially certain to befall him or with conscious

4 | disregard of the high probability of such injury. Defendants' denial and withholding of basic

5 | care to Decedent ERIC caused him injuries, needless suffering, and emotional distress.

6 | Furthermore, Defendants withheld medical care by failing to assess and reassess Decedent

7 | ERIC's condition, update individualized care plan(s), and monitor his condition to see

8 | whether he was improving, or worsening.

9 |      65.    Defendants failed to provide Decedent ERIC with the care and treatment he

10 | needed, failed to ensure adequate nutritional and fluid intake, promote and maintain

11 | personal hygiene, and monitor and manage his pain levels. Defendants failed to monitor,

12 | assess, and reassess Decedent ERIC's deteriorating condition and to report his changes of

13 | condition to his physician and/or family to arrange for a higher level of care. Thus, there was

14 | repeated withholding of care when Defendants failed to implement care plans with adequate

15 | monitoring of his intake and output.

16 |      66.    Defendants failed to meet Decedent ERIC's need for care and basic services,

17 | to avoid needless suffering, injury, and emotional distress, by making a conscious choice to

18 | understaff the nursing home, in both quantity and quality of nursing personnel. The decision

19 | to understaff was made at the corporate level by Defendant CENTINELA (THE LICENSEE),

20 | Defendant BRIUS MANAGEMENT CO., and Defendant TAMAR RECHNITZ, to increase

21 | the profitability of the nursing home, in conscious disregard of patient care needs.

22 | Defendants, together with its directors, officers, and managing agents including the

23 | Administrator, Director of Nursing, and Medical Director, conceived of and implemented a

24 | plan to increase business profits at the expense of residents like Decedent ERIC and other

25 | Defendant FACILITY residents. Integral to this plan was the practice and pattern of

26 | Defendants' staffing its facilities with an insufficient number of care personnel, many of

27 |

28 |

1 whom were not properly trained nor qualified to care for the elders whose lives were
2 entrusted to them. The understaffing and lack of training was designed to reduce labor costs
3 and to increase profits and resulted in high staff turnover and the physical abuse and neglect
4 of many residents of the facilities and most specifically, Decedent ERIC. This corporate
5 policy to not maintain sufficient staffing, as required by law, was developed and
6 implemented with the conscious disregard for the likelihood of physical harm and injury to
7 those who it is in the business to protect, including Decedent ERIC, who did in fact suffer
8 as a direct consequence of the Defendants' proprietary interests, which it placed above that
9 of Decedent ERIC, and other residents/patients.

10       67.   Defendants had a duty to employ adequate numbers of sufficiently staffed
11 employees to provide minimum services and oversight of residents, policies and procedures
12 to ensure that basic services and oversight are implemented to assure the health and safety
13 of residents, employment and training of staff such that staff is experienced and competent
14 to perform the job duties necessary to assure safety and oversight of residents, accepting,
15 training, and employing staff in a manner that avoids "a revolving door" of crucial managerial
16 employees such that there is little or no continuity and/or an absence of crucial managerial
17 employees at critical times, such as the initial admission of a resident to the FACILITY.

18       68.   Defendants knew or should have known that by understaffing their facilities,
19 in quantity and quality, they were putting Defendant FACILITY residents, including
20 Decedent ERIC, at risk for known, harmful, life threatening conditions, including dehydration
21 and death. This is because Defendants, and each of them, including the owners, operators,
22 administrators, and directors of nursing understand the direct relationship between staffing
23 and patient outcomes. The higher the staffing ratio, the better the patient outcome.

24       69.   Defendants, and each of them, knew or should have known that Defendant
25 FACILITY's operation was designed and operated in a manner to circumvent its legal duty
26 to comply with applicable statutes and regulations to maximize profitability. That knowledge

27

28

*COMPLAINT*

1  was exclusively in the possession of the Defendants. Decedent ERIC and his family had no
2  such knowledge, nor the opportunity to obtain such knowledge and information. Decedent
3  ERIC and his family believed that Defendants' business operations were, as represented
4  by the Defendants, properly run in compliance with the law and that the care afforded to its
5  residents was within all State guidelines. They understood that the management and staff
6  at Defendant FACILITY were "experts" and were readily familiar, capable, able, and
7  committed to the care and oversight of residents such as Decedent ERIC. Such
8  representations were fraudulent.  Further, Defendants' conduct was reckless and in
9  conscious disregard of Decedent ERIC's rights and safety.

10      70.   Defendants convinced Decedent ERIC and his family they were able to meet
11  her care needs. Defendants knew those promises and assurances were untrue.
12  Defendants knew the Defendant FACILITY was rated poorly and was in fact a failing facility
13  providing poor care when they made those statements.  Defendants knew the Defendant
14  FACILITY was not properly staffed, was not providing proper care, and would not provide
15  proper care to Decedent ERIC. The purpose of their promises and assurances was to
16  induce Decedent ERIC to select Defendant FACILITY purely for financial gain. Their
17  statements were false and were part of Defendants' business model of making fraudulent
18  representations to elderly and dependent persons like Decedent OLGA. This constitutes
19  unfair business practices directed at the elderly.

20      71.   This continual pattern of withholding care and understaffing at Defendant's
21  FACILITY was well known to the Defendants and their officers, directors, and managing
22  agents, Administrator, Director of Nursing, and Medical Director. Upon information and
23  belief, Defendant FACILITY's Administrator, Director of Nursing, and Medical Director
24  routinely reported up the chain of command to corporate managing agents about what was
25  happening on the floor at the nursing home.  Upon information and belief, Defendant
26  FACILITY's Administrator, Director of Nursing, and Medical Director also routinely reported

27

28

1    admission, discharge and staffing data, and Defendants directed and controlled the staffing
2    budget by allocating resources, setting staffing minimums and maximums, and directing
3    staff to patient ratios. By law, Defendants were responsible for setting policies and
4    procedures to be implemented in the Defendant FACILITY and provide supervision and
5    oversight of administration and nursing services by and through managers and directors.

6    　　　　72.　　These corporate managing agents had a duty to direct the nurses and staff
7    yet did not make the necessary changes at Defendant FACILITY, even with knowledge of
8    substandard care, failures to assess, monitor, and respond to changes in resident
9    condition, inadequate custodial care, inadequate hygiene, and inadequate safety
10   measures at the facility. The managing agents of each Defendant knew or should have
11   known of the lack of proper custodial care to its patients, as well as its understaffing, poor
12   training, and the failure to implement care plans based on internal reporting and also the
13   oversight, monitoring, and reporting of the Department of Public Health.  Any and all
14   findings of the Department of Public Health regarding care failures at Defendant FACILITY
15   were reported up the corporate chain. Despite each Defendant's conscious knowledge of
16   these conditions, the managing agents of each Defendant did not take appropriate and
17   adequate steps to prevent and correct them, and they did not inform Decedent ERIC or his
18   family of what they knew about these dangerous conditions.

19   　　　　73.　　Defendants, and their officers, directors and managing agents of the
20   Defendants' FACILITY, including the Administrator, Director of Nursing, and Medical
21   Director, knew or should have known that the Defendants' FACILITY's operation was
22   designed in a manner so as to maximize profitability by circumventing the legal duty to
23   assure the health, safety, and oversight of residents such as Decedent ERIC and, in
24   particular, the duty to hire competent employees, to train those employees and to terminate
25   or discipline employees for misconduct towards the residents, including Decedent ERIC.
26   As a result, Defendants' and their officers, directors, and managing agents, including the

27

28
　　　　　　　　　　　　　　　　　　　　19

1   Administrator, Director of Nursing, and Medical Director, had knowledge of, ratified and/or
2   otherwise authorized all of the acts or omissions, which caused the injuries to Decedent
3   ERIC.

4       74.    LVNs are per se "unfit" to perform the functions of an RN, just as an RN is
5   per se "unfit" to perform the functions of a medical doctor. Here, Defendants authorized
6   and ratified the use of LVNs to perform assessments that they were not licensed or qualified
7   to perform. As a direct and proximate result of using unfit LVNs to perform assessments,
8   the LVN-based assessments and care plans done for Decedent ERIC were incomplete
9   and inadequate and resulted in Decedent ERIC not getting the interventions he needed to
10  prevent him becoming dehydrated, malnourished, developing infection, and dying.

11      75.    As a proximate result of the abuse and neglect of Decedent ERIC by
12  Defendant LVNs, and each of them, Decedent OLGA died on April 19, 2020.

13      76.    As a proximate result of the abuse and neglect of Decedent ERIC by
14  Defendants and each of them, he was caused to incur medical expenses and other related
15  expenses, all to his special damages in a sum to be established.

16      77.    As a proximate result of the abuse and neglect of Decedent ERIC by
17  Defendants, and each of them, he suffered fear, anxiety, humiliation, physical pain and
18  discomfort, and emotional distress, all to his general damages in a sum to be established.

19      78.    By the conduct, acts and omissions of Defendants, and each of them, as
20  alleged above, they are guilty of recklessness, fraud, oppression, and/or malice. The
21  specific facts set forth above show a disregard of the high probability that Decedent ERIC
22  would be injured. In addition to special damages, Plaintiff is therefore entitled to an award
23  of the reasonable attorney's fees and costs incurred in prosecuting this case as well as
24  Decedent ERIC's pain and suffering and punitive damages pursuant to Welfare &
25  Institutions Code § 15657 and Civil Code § 3294.

26
27                                              20
28                                          COMPLAINT

**SECOND CAUSE OF ACTION**

**VIOLATION OF PATIENT RIGHTS**

**[Health & Safety Code § 1430(b)]**

**(Against Defendants CENTINELA SKILLED NURSING & WELLNESS CENTRE WEST, LLC dba CENTINELA SKILLED NURSING & WELLNESS CENTRE WEST and DOES 1-25)**

79.    Plaintiff incorporates by reference Paragraphs 1 through 78 of this Complaint as though fully set forth.

80.    The acts and omissions of Defendants alleged above constitute violations of patients' rights within the meaning of Health and Safety Code § 1430(b). This statute allows a current or former resident to pursue damages, attorney's fees, and an injunction for violations of patients' rights set forth in Title 22 of the California Code of Regulations § 72527 and other state and federal laws and regulations.

81.    Here, Defendants' conduct as described in the foregoing sections violated several of Decedent ERIC's statutory rights, including but not limited to:

       a.  Right to be treated with consideration, respect, and full recognition of dignity (Cal. Code Regs., tit. 22, § 72527(a)(12));

       b.  Right to have individualized individual care needs identified based on assessment of patient's needs with input from patient and, if necessary, health professionals involved in the care of the patient (Cal. Code Regs., tit. 22, § 72311(a)(1)(A)); 42 C.F.R. §§ 19   483.10(f), 483.20(b)(1);  42 U.S.C. § 1395i-3(b)(3));

       c.  Right to receive care as implemented by individualized written patient care plan indicating the care to be given, objectives to be accomplished, and the professional discipline responsible for each element of care (Cal. Code Regs., tit. 22, § 72311(a)(1)(B); 42 C.F.R. § 483.10(c));

       d.  Right to have patient care plans reviewed, evaluated, and updated as

21

*COMPLAINT*

1    necessary and more often if there is a change of the patient's condition

2    (Cal. Code Regs., tit. 22, § 26 72311(a)(1)(C));

3    e.  Right to receive care as implemented by the patient care plan according

4        to the methods indicated (Cal. Code Regs., tit. 22, § 72311(a)(2); 42

5        U.S.C. § 1395i-3(b)(4));

6    f.  Right to receive care pursuant to physician's orders in the administration

7        of medication and/or treatment, to have medication and treatment as

8        prescribed, and for a record of the administration of medication and

9        treatment prepared (Cal. Code of Regs., tit. 22, §§ 72313 (a)(1)-(2) and

10       (c));

11   g.  Right to have a record of nurses' notes that are clear and legible, dated

12       and signed, among other qualifications, including narratives or how a

13       patient responds, eats, drinks, looks, feels, and reacts (Cal. Code Regs.,

14       tit. 22, § 72547(a)(5));

15   h.  Right for the resident or responsible party to have the opportunity to

16       participate in an immediate and ongoing basis in the total plan of care

17       including identification of medical, nursing, and psychosocial needs and

18       the planning of related services (Cal. Code Regs., tit. 11 22,           §

19       72527(a)(3); 42 C.F.R. § 483.10(c));

20   i.  Right to have physician notified of any change of condition and to have

21       all attempts to notify physician noted in patient's health record (Cal. Code

22       Regs., tit. 22, § 72311(a)(3) and (b));

23   j.  Right to receive pharmaceutical and physical therapy services for

24       effective pain management (Cal. Code Regs., tit. 22, §§ 72355,

25       72403(b)(3));

26   k.  Right to receive care in such a manner and in such an environment by

27

28

**COMPLAINT**

1   facility staff to befree from mental and physical abuse and neglect (Cal.

2   Code Regs., tit. 22, § 72527(a)(10); 42 C.F.R. § 483.12);

3       I.   Duty to provide adequate number of qualified personnel to carry out all

4       functions of the facility and to meet patients' needs as well as adequate

5       training and competent supervision (Cal. Code of Regs., tit. 22, §§ 72329

6       and 72329.1; Health & Saf. Code, § 1599.1(a); 42 C.F.R. §§ 483.35,

7       483.95).

8       82.   Defendants violated the above-referenced patient's rights when they failed to

9   provide appropriate services to prevent serious injury to Decedent OLGA.

10       83.   Plaintiff is entitled to attorney's fees and costs and an injunction to prevent

11   further violations, in addition to other remedies set forth in Health and Safety Code section

12   1430(b).

13   **THIRD CAUSE OF ACTION**

14   **NEGLIGENCE**

15   **(Against Defendants CENTINELA SKILLED NURSING & WELLNESS CENTRE
16   WEST, LLC dba CENTINELA SKILLED NURSING & WELLNESS CENTRE WEST,
BRIUS MANAGEMENT CO., TAMAR RECHNITZ, and DOES 1-25)**

17       84.   Plaintiff incorporates by reference Paragraphs 1 through 83 of this Complaint
18   as though fully set forth.

19       85.   At all times herein mentioned, Defendants had a duty to exercise reasonable
20   and ordinary care in providing custodial care services to Decedent ERIC and/or in providing

21   health care services to Decedent ERIC.

22       86.   At the above-mentioned times and place, Defendants, by their respective
23   acts or omissions, were careless and breached their respective aforementioned duty owed

24   to Decedent ERIC by: negligently and carelessly failing to exercise reasonable and

25   ordinary care to provide custodial care services to Decedent ERIC; negligently and

26   carelessly failing to exercise reasonable and ordinary care to provide health care services

27

28

to Decedent ERIC; negligently and carelessly failing to adequately supervise and/or monitor Decedent ERIC; negligently and carelessly failing to hire, train and supervise; negligently and carelessly failing to exercise reasonable and ordinary care to provide custodial care services to Decedent ERIC; negligently and carelessly failing to be adequately staffed to appropriately care for and treat Decedent ERIC; negligently and carelessly failing to implement appropriate measure and interventions to ensure that Defendant FACILITY, as a SNF, was adequately staffed to appropriately care for and treat Decedent ERIC; negligently and carelessly failing to take appropriate measures to prevent injury to Decedent ERIC; negligently and carelessly failing to adequately assess the care needs of Decedent ERIC; negligently and carelessly failing to adequately implement appropriate interventions to address the care needs of Decedent ERIC; negligently and carelessly failing to have appropriate policies and procedures in place and for failing to follow appropriate policies and procedures; and/or negligently and carelessly failing to otherwise care for and treat Decedent ERIC consistent with the standard of care, which upon information and belief, will be disclosed through discovery in the course of this litigation.

87.    As a direct and proximate result of these tortious acts, omissions, and/or conduct of Defendants, Plaintiff was damaged, injured, and harmed, all of which have caused Decedent ERIC great mental, physical and emotional distress, pain and suffering, all to Plaintiffs' damage in a sum to be determined according to proof at the time of trial.

## FOURTH CAUSE OF ACTION

## WRONGFUL DEATH

**(Against Defendants CENTINELA SKILLED NURSING & WELLNESS CENTRE WEST, LLC dba CENTINELA SKILLED NURSING & WELLNESS CENTRE WEST, BRIUS MANAGEMENT CO., TAMAR RECHNITZ, and DOES 1-25)**

88.    Plaintiff incorporates by reference Paragraphs 1 through 87 of this Complaint as though fully set forth.

24

*COMPLAINT*

89.     Plaintiff SHALIMAH is the surviving heir and natural daughter of Decedent ERIC.

90.     As a proximate result of the conduct alleged above, perpetrated by Defendants, Decedent ERIC died on April 19, 2020.

91.     Prior to the death of Decedent ERIC, Plaintiff SHALIMAH enjoyed the love, society, comfort, and attention of her father.

92.     As a proximate result of the wrongful act of Defendants, as alleged herein, which caused the death of Decedent ERIC, Plaintiff SHALIMAH sustained pecuniary loss of the love, comfort, companionship, solace, society, training, guidance, and attention of Decedent ERIC, in a sum according to proof at trial.

<strong>RELIEF REQUESTED / PRAYER</strong>

1.     <u>On the First Cause of Action:</u>

    a. For compensatory damages in an amount in excess of the minimum jurisdiction of this court to be ascertained at the time of trial; and

    b.  For special damages including past hospital, medical, professional, and incidental expenses, according to proof; and

    c. For interest on any compensatory damages;

    d. For attorney's fees and costs pursuant to Welfare & Institutions Code § 15657 and according to proof; and

    e. For punitive and/or exemplary damages pursuant to Welfare & Institutions Code § 15657 and Civil Code  § 3294; and

    f.  For treble damages pursuant to Civil Code § 3345;

2.     <u>On the Second Cause of Action:</u>

    a. For statutory damages according to proof pursuant to Health & Safety Code section 1430(b); and

    b. For attorney's fees and costs pursuant to Health & Safety Code section

25

<em>COMPLAINT</em>

1430(b);

3.  On the Third and Fourth Causes of Action:

    a. For compensatory damages in an amount in excess of the minimum jurisdiction of this court to be ascertained at the time of trial; and

    b. For special damages including funeral and burial expenses, medical and incidental expenses according to proof; and

    c. For interest on any compensatory damages;

4.  On all counts

    a. For costs of suit; and

    b. Whatever further relief the court may find just and proper.

DATED: May 11, 2021                    THE BARNES FIRM, LC

By: _____
    Christian R. Oliver
    Attorneys for Plaintiffs

26

*COMPLAINT*

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury.

DATED: May 11, 2021                    THE BARNES FIRM, LC


By: _____
                    Christian R. Oliver
                    Attorneys for Plaintiffs

27

*COMPLAINT*

# EXHIBIT B

**DEPARTMENT OF HEALTH & HUMAN SERVICES**                     Office of the Secretary

The General Counsel
Washington, D.C. 20201

August 14, 2020

Thomas Barker
Foley Hoag LLP
1717 K Street, N.W.
Washington, DC 20006-5350

Dear Mr. Barker:   / M,

Thank you for your July 20, 2020 letter seeking confirmation that senior living communities are "covered persons" under the Public Readiness and Emergency Preparedness Act, 42 U.S.C. § 247d-6d, (the PREP Act) when performing certain functions during this declared emergency.

For the reasons set forth below, we conclude that senior living communities are "covered persons" under the PREP Act when they provide a facility to administer or use a covered countermeasure in accordance with the Secretary's March 10, 2020 Declaration under the PREP Act. *See* 85 Fed. Reg. 15,198 (March 17, 2020) (Declaration).[1]

Under the PREP Act and the Declaration, "covered persons," when used with respect to the administration or use of a covered countermeasure, "include manufacturers, distributors, program planners, and qualified persons, and their officials, agents, and employees." *Id.* at 151,199; *see also* 42 U.S.C. § 247d-6d(i)(2). The statute defines "program planner" as a

> State or local government, including an Indian tribe, a person employed by the State or local government, or other person who supervised or administered a program with respect to the administration, dispensing, distribution, provision, or use of a security countermeasure or a qualified pandemic or epidemic product, including a person who has established requirements, provided policy guidance, or supplied technical or scientific advice or assistance or provides a facility to administer or use a covered countermeasure in accordance with a declaration under subsection (b).

42 U.S.C. § 247d-6d(i)(6).

---

[1] This letter addresses only whether senior living communities can be "covered persons." To receive PREP Act immunity, the covered person must satisfy other requirements of the PREP Act and the Secretary's declaration under the Act.

Thomas Barker
August 14, 2020
Page 2

The Declaration incorporates this definition, and its preamble explains that a program planner can be a "private sector employer or community group" that "carries out the described activities." 85 Fed. Reg. at 15,201. Thus, a senior living community meets the definition of a "program planner" to the extent that it supervises or administers a program with respect to the administration, dispensing, distribution, provision, or use of a security countermeasure or a qualified pandemic or epidemic product, including by "provid[ing] a facility to administer or use a Covered Countermeasure in accordance with" the Declaration.

This letter sets forth the current views of the Office of the General Counsel.[2] It is not a final agency action or a final order. Nor does it bind HHS or the federal courts. It does not have the force or effect of law.[3]

Sincerely yours,

Robert P. Charrow
General Counsel

---

[2] *See Air Brake Sys., Inc. v. Mineta*, 357 F.3d 632, 647-48 (6th Cir. 2004) (holding that the Chief Counsel of the National Highway Traffic Safety Administration had delegated authority to issue advisory opinions to regulated entities in fulfillment of a congressional directive to promote regulatory compliance); 5 U.S.C. § 301 ("The head of an executive department . . . may prescribe regulations for the government of his department, the conduct of its employees, [and] the distribution and performance of its business[.]").

[3] It is possible that a senior living community could also be a "qualified person." Under the PREP Act, "qualified person" includes a "person within a category of persons so identified in" a PREP Act declaration. 42 U.S.C. § 247d-6d(i)(8). The Declaration defined "qualified person" to include "[a]ny person authorized in accordance with the public health and medical emergency response of the Authority Having Jurisdiction…to prescribe, administer, deliver, distribute or dispense the Covered Countermeasures, and their officials, agents, employees, contractors, and volunteers." 85 Fed. Reg. at 15,201-15,202. To the extent a senior living community were so authorized, it could be a qualified person.

# EXHIBIT C



**DEPARTMENT OF HEALTH AND HUMAN SERVICES**

**Guidance**
Office of the Secretary

Office of the Assistant Secretary for Health
Washington, D.C.  20201

U.S. Department of Health & Human Services
Office of the Assistant Secretary for Health
August 31, 2020

### Guidance for PREP Act Coverage for COVID-19 Screening Tests at Nursing Homes, Assisted-Living Facilities, Long-Term-Care Facilities, and other Congregate Facilities

On January 31, 2020, the Secretary of Health and Human Services declared that the 2019 novel coronavirus (COVID-19) is a public-health emergency for the United States.[1]  The United States Department of Health and Human Services (HHS) is the lead agency for the federal government's response to the COVID-19 pandemic.

A key component of that response is rapidly expanding COVID-19 testing across America.  Within HHS, the Office of the Assistant Secretary for Health leads federal efforts to support that expansion. Enhancing the safety of nursing homes, assisted-living facilities, long-term-care facilities, and other facilities where people congregate to receive care or education or to work (collectively, "congregate facilities") is critical for our Nation's response to the COVID-19 pandemic.  Testing for COVID-19, including those who are asymptomatic, is a key part of that effort.[2]

---

[1] The Secretary's declaration of a public health emergency was retroactively effective on January 27, 2020.

[2] *See, e.g.*, Interim SARS-CoV-2 Testing Guidelines for Nursing Home Residents and Healthcare Personnel, available at https://www.cdc.gov/coronavirus/2019-ncov/hcp/nursing-homes-testing.html (last visited Aug. 29, 2020) (explaining that, in addition to nursing homes, "testing residents with signs or symptoms of COVID-19 and testing asymptomatic close contacts should also be applied to other long-term care facilities (e.g., assisted living facilities, intermediate care facilities for individuals with intellectual disabilities, institutions for mental disease, and psychiatric residential treatment facilities)"); Testing in Institutions of Higher Education, available at https://www.cdc.gov/coronavirus/2019-ncov/community/colleges-universities/ihe-testing.html (last visited Aug. 29, 2020) ("In areas with moderate to substantial community transmission where resources allow, local health officials and [institutions of higher learning] may consider testing some or all asymptomatic students, faculty, and staff who have no known exposure (e.g., students in congregate housing such as residence halls) to identify outbreaks and inform control measures."); Testing asymptomatic individuals without known or suspected exposure to SARS-CoV-2 for early identification in special settings, available at https://www.cdc.gov/coronavirus/2019-ncov/community/organizations/testing-non-healthcare-workplaces.html#testing-3 (last visited Aug. 29, 2020) ("Viral testing of workers without symptoms may be useful to detect COVID-19 early and stop transmission quickly, particularly in areas with moderate to substantial community transmission.").

Both the Food and Drug Administration (FDA) and the Centers for Medicare & Medicaid Services (CMS) have issued guidance and provided other information regarding screening asymptomatic individuals, including in congregate settings.

According to FDA,

> For health care providers who are ordering an authorized SARS-CoV-2 diagnostic test to be used off-label (outside the authorization) to screen asymptomatic individuals not suspected of having COVID-19, we recommend they consider the information below. Although the current available literature suggests that symptomatic individuals with COVID-19 and asymptomatic individuals without known exposure may have similar levels of viral genetic material, there is limited data on the distribution of viral loads in individuals with and without symptoms across demographics, different settings, and specimen types. Therefore, when screening asymptomatic individuals, health care providers should consider using a highly sensitive test, especially if rapid turnaround times are available. If highly sensitive tests are not feasible, or if turnaround times are prolonged, health care providers may consider use of less sensitive point-of-care tests, even if they are not specifically authorized for this indication (commonly referred to as "off-label"). For congregate care settings, like nursing homes or similar settings, repeated use of rapid point-of-care testing may be superior for overall infection control compared to less frequent, highly sensitive tests with prolonged turnaround times.[3]

CMS has concluded that

> [it] requires facilities with a CLIA Certificate of Waiver to follow the manufacturer's instructions (Instructions For Use) when performing laboratory testing. The FDA has granted Emergency Use Authorizations (EUA) to certain antigen tests for testing specimens from individuals who are suspected of COVID-19 by their healthcare provider within a number of days after the onset of symptoms, specific to each authorized test's validated performance. The FDA has provided recommendations for health care providers who are ordering authorized tests outside their authorization (e.g., antigen tests for asymptomatic individuals)— see FDA's FAQ on Testing for SARS-CoV-2 ("Q: Does the FDA have recommendations for health care providers using SARS-CoV-2 diagnostic tests for screening asymptomatic individuals for COVID-19?") for further information.

> CMS will temporarily exercise enforcement discretion for the duration of the COVID-19 public health emergency under CLIA for the use of SARS-CoV-2 POC antigen tests on asymptomatic individuals. Specifically, CMS will not cite facilities with a CLIA Certificate of Waiver when SARS-CoV-2 POC antigen tests are performed on asymptomatic individuals, as described in the FDA FAQ.[4]

Therefore, as an Authority Having Jurisdiction under the Secretary's March 10, 2020 declaration under the Public Readiness and Emergency Preparedness Act (PREP Act),[5] Assistant Secretary for

---

[3] General FAQs, Q: Does the FDA have recommendations for health care providers using SARS-CoV-2 diagnostic tests for screening asymptomatic individuals for COVID-19?, available at https://www.fda.gov/medical-devices/coronavirus-covid-19-and-medical-devices/faqs-testing-sars-cov-2#general, (last visited Aug. 29, 2020).

[4] What is CMS's policy regarding laboratories performing antigen tests authorized by the Food and Drug Administration (FDA) under an Emergency Use Authorization (EUA) for use at the point of care (POC) or in patient care settings operating under a Clinical Laboratory Improvement Amendments of 1988 (CLIA) Certificate of Waiver on asymptomatic individuals?, available at https://www.cms.gov/files/document/clia-poc-ag-test-enforcement-discretion.pdf (last visited Aug. 29, 2020).

[5] Declaration Under the Public Readiness and Emergency Preparedness Act for Medical

Health, Admiral Brett P. Giroir, M.D., extends coverage under the PREP Act to licensed health-care practitioners prescribing or administering point-of-care COVID-19 tests, using anterior nares specimen collection or self-collection, for screening in congregate facilities across the Nation. Such tests must be authorized, approved, or cleared by the FDA (collectively, FDA-authorized COVID-19 tests).

PREP Act coverage encompasses licensed health-care practitioners prescribing or administering FDA-authorized COVID-19 tests, including for off-label (outside the authorization) use to screen asymptomatic individuals in congregate facilities.[6]

In addition to the requirements set forth herein, licensed health-care practitioners must comply with the requirements of the PREP Act and the conditions of the Secretary's declaration under the PREP Act in order to receive PREP Act coverage.[7]

This PREP Act coverage preempts any State or local provision of law or legal requirement that prohibits or effectively prohibits such licensed health-care practitioners from administering or prescribing FDA-authorized COVID-19 tests to symptomatic or asymptomatic individuals at congregate facilities.[8]

---

Countermeasures Against COVID–19, 85 Fed. Reg. 15,198 (Mar. 17, 2020).

[6] FDA determines the scope of on-label authorization.

[7] *See, e.g.*, Advisory Opinion on the Public Readiness and Emergency Preparedness Act and the Secretary's Declaration under the Act, available at https://www.hhs.gov/sites/default/files/prep-act-advisory-opinion-hhs-ogc.pdf (last visited Aug. 29, 2020).

[8] *See, e.g.*, Advisory Opinion 20-02 on the Public Readiness and Emergency Preparedness Act and the Secretary's Declaration under the Act, available at https://www.hhs.gov/sites/default/files/advisory-opinion-20-02-hhs-ogc-prep-act.pdf (last visited Aug. 29, 2020).

# EXHIBIT D



**DEPARTMENT OF HEALTH & HUMAN SERVICES**                     Office of the Secretary

The General Counsel
Washington, D.C. 20201

## ADVISORY OPINION 21-01 ON THE
## PUBLIC READINESS AND EMERGENCY PREPAREDNESS ACT
## SCOPE OF PREEMPTION PROVISION
## JANUARY 8, 2021

Following the issuance by the Secretary on December 3, 2020, of the Fourth Amendment to his Declaration Under the Public Readiness and Emergency Preparedness Act for Medical Countermeasures Against COVID-19, we have received questions as to whether the PREP Act applies where a covered person declined to use a covered countermeasure when it arguably ought to have been used.[1] *See* 85 Fed. Reg. 79,190 (Dec. 9, 2020). These inquiries were stimulated, as we understand, by a spate of recent lawsuits, most involving nursing homes and other healthcare facilities, where patients or their estates allege that patients contracted COVID-19 because the facility, among other things, failed to provide its staff with personal protective equipment ("PPE"), failed to teach the staff how to properly use that equipment, or failed to ensure that its staff used the PPE that it had been given. This Advisory Opinion addresses these questions in the context of our administration of the PREP Act and the Secretary's PREP Act Declaration, as amended.

### I.        Analysis

There has been a growing number of suits related to the use or non-use of covered countermeasures against COVID-19, including PPE. These cases tend to be filed in state courts alleging a variety of state law-based torts. In this "jurisprudential Kabuki dance" (*Maine Public Utilities Com'n v. F.E.R.C.*, 625 F.3d 754, 758 (D.C. Cir. 2010)), defendants file removal petitions and plaintiffs respond with remand motions. To resolve the remand motions, courts first assess whether the doctrine of complete preemption applies. Ordinary preemption is a defense and does not support Article III subject matter jurisdiction (usually under 28 U.S.C. § 1331), a prerequisite for removal. *See Merrell Dow Pharmaceuticals v. Thompson*, 478 U.S. 804 (1986). In contrast, complete preemption is "really a jurisdictional rather than a preemption doctrine, [as it] confers exclusive federal jurisdiction in certain instances where Congress intended the scope of a federal law to be so broad as to entirely replace any state-law claim." *Marin General Hosp. v. Modesto & Empire Traction Co.*, 581 F.3d 941, 945 (9th Cir. 2009) (quoting *Franciscan Skemp Healthcare, Inc. v. Cent. States Joint Bd. Health & Welfare Trust Fund,* 538 F.3d 594, 596 (7th Cir. 2008) (internal quotations omitted). Relatively few statutes completely preempt.

---

[1]        The PREP Act is the Public Readiness and Emergency Preparedness Act, Pub. L. No. 109-148, div. C, § 2, 119 Stat. 2818 (Dec. 30, 2005), codified at 42 U.S.C. §§ 247d-6d, 247d-6e. It has been amended through the Pandemic and All-Hazards Preparedness Reauthorization Act of 2013, Pub. L. No. 113–5, title IV, § 402(g)(2), (3), 127 Stat. 196 (Mar. 13, 2013) and further amended by § 6005 of the Families First Coronavirus Response Act, Pub. L. No. 116-127, 134 Stat. 177 (March 18, 2020) and § 3103 of the Coronavirus Aid Relief, and Economic Security Act, Pub. L. No. 116-136, 134 Stat. 281 (March 27, 2020).

## A.      The PREP Act is a "Complete Preemption" Statute

The Supreme Court first articulated the doctrine of complete preemption as a basis for federal question removal jurisdiction under 28 U.S.C. § 1441(a) in *Avco Corp. v. Aero Lodge No. 735, Intern. Ass'n of Machinists and Aerospace Workers*, 390 U.S. 557, 559 (1968) (holding that the Labor Management Relations Act, 1947 completely preempted state court jurisdiction). Thereafter, the doctrine was extended to the Employee Retirement Income Security Act of 1974 in 1987, the National Bank Act in 2003, and the Air Transportation Safety and System Stability Act in 2005.  *See Metropolitan Life Insurance Co. v. Taylor*, 481 U.S. 58 (1987) (ERISA completely preempts state law); *Aetna Health Inc. v. Davila*, 542 U.S. 200 (2004) (the same); *Beneficial Nat'l Bank v. Anderson*, 539 U.S. 1, 7–11 (2003) (National Bank Act completely preeempts); *In re WTC Disaster Site*, 414 F.3d 352, 375 (2d Cir. 2005) (Air Transportation Safety and System Stability Act completely preempted state claims and ousted state courts of jurisdiction by creating an exclusive federal cause of action).  The *sine qua non* of a statute that completely preempts is that it establishes either a federal cause of action, administrative or judicial, as the only viable claim or vests exclusive jurisdiction in a federal court.  The PREP Act does both.

Once complete preemption attaches, the district court is usually obligated to dismiss the case as pleaded, either because no federal cause of action is alleged or the exclusive initial venue is a federal administrative agency.

All that is well and good, but it does not address the issue that appears to have perplexed district courts, namely when is the PREP Act triggered.  District courts appear to have labored hard attempting to ordain whether the non-use of a covered countermeasure triggers the PREP Act and its complete preemption regime.  At one extreme, plaintiff may have pleaded that the facility failed *in toto* to provide any of its staff or patients with any PPE, a covered countermeasure if NIOSH approved or FDA cleared or waived.  Other plaintiffs allege that the quantity of PPE was inadequate, that staff were not timely provided PPE or that staff were not adequately trained to use PPE.  The latter three complaints reflect many of the complaints that we have reviewed.

The PREP Act's immunity provision, which triggers exclusive federal jurisdiction, states as follows:

> Subject to the other provisions of this section, a covered person shall be immune from suit and liability under Federal and State law with respect to all claims for loss caused by, arising out of, relating to, or resulting from the administration to or the use by an individual of a covered countermeasure if a declaration under subsection (b) has been issued with respect to such countermeasure.

Public Health Service Act § 319F-3(a)(1), 42 U.S.C. § 247d-6d(a)(1) (emphasis supplied).

The PREP Act goes on to provide that its immunity

> applies to any claim for loss that has a causal relationship with the administration to or use by an individual of a covered countermeasure, including a causal

2

> relationship with the design, development, clinical testing or investigation, manufacture, labeling, distribution, formulation, packaging, marketing, promotion, sale, purchase, donation, dispensing, prescribing, administration, licensing, or <u>use</u> of such countermeasure.

*Id*. at § 319F-3(a)(2)(B), 42 U.S.C. § 247d-6d(a)(2)(B) (emphasis supplied).

Some district courts have interpreted the scope of the immunity in subparagraph (B) as requiring "use." Under this view, if a covered countermeasure were not used, then there is no PREP Act immunity. According to one court, "[t]here is simply no room to read [the PREP Act] as equally applicable to the non-administration or non-use of a covered countermeasure." *Lutz v. Big Blue Healthcare, Inc*., ___F. Supp. 3d ___, 2020 WL 4815100, at *8 (D. Kan. 2020) (emphasis in original) (granted remand motion).

However, this "black and white" view clashes with the plain language of the PREP Act, which extends immunity to anything "relating to" the administration of a covered countermeasure. For example, consider a situation where there is only one dose of a COVID–19 vaccine,[2] and a person in a vulnerable population and a person in a less vulnerable population both request it from a healthcare professional. In that situation, the healthcare professional administers the one dose to the person who is more vulnerable to COVID–19. In that circumstance, the failure to administer the COVID–19 vaccine to the person in a less-vulnerable population "relat[es] to . . . the administration to" the person in a vulnerable population. The person in the vulnerable population was able to receive the vaccine only because it was not administered to the person in the less-vulnerable population. Prioritization or purposeful allocation of a Covered Countermeasure, particularly if done in accordance with a public health authority's directive, can fall within the PREP Act and this Declaration's liability protections. There can potentially be other situations where a conscious decision not to use a covered countermeasure could relate to the administration of the countermeasure. In contrast, the failure to purchase any PPE, if not the outcome of some form of decision-making process may not be sufficient to trigger the PREP Act.

Where a facility has been allocated a scarce therapeutic purchased by the federal government and that facility fails to administer that therapeutic to an individual who meets the requirements of the FDA's authorization, approval, or license, and whose physician prescribes that therapeutic, then the facility's refusal to administer that therapeutic could still trigger the PREP Act assuming the non-use of the therapeutic was the result of conscious decision-making. However, the facility may still be liable under the PREP Act, if the plaintiff alleges that the decision to deny him or her the therapeutic was wanton and willful and resulted in death or serious injury. *See* 42 U.S.C. § 247d-6d(d)-(e). Such a case would be transferred to the District Court for the District of Columbia for resolution by a three-judge panel. The facility may also be subject to a federal enforcement action.

---

[2] For simplicity, this example assumes a patient only requires one dose of the vaccine.

The language of the PREP Act itself supports a distinction between allocation which results in non-use by some individuals, on the one hand, and nonfeasance, on the other hand, that also results in non-use.

Included within the set of "covered persons," *i.e*., those entitled to immunity, are "program planners."  42 U.S.C. § 247d-6d(i)(2)(B)(iii).  A "program planner" is

> a State or local government, including an Indian tribe, a person employed by the State or local government, or other person who supervised or administered a program with respect to the administration, dispensing, distribution, provision, or use of a security countermeasure or a qualified pandemic or epidemic product, including a person who has established requirements, provided policy guidance, or supplied technical or scientific advice or assistance or provides a facility to administer or use a covered countermeasure in accordance with a declaration under subsection (b).

*Id.* at § 247d-6d(i)(6).

A program planner is someone who is involved in providing or allocating covered countermeasures.  Program planning inherently involves the allocation of resources and when those resources are scarce, some individuals are going to be denied access to them.  Therefore, decision-making that leads to the non-use of covered countermeasures by certain individuals is the grist of program planning, and is expressly covered by PREP Act

There are going to be circumstances where plaintiff pleads that defendant's culpability is the result of its failure to make any decisions whatsoever, thereby abandoning its duty to act as a program planner or other covered person.  Although this is a small hole through which to wiggle to avoid complete preemption, we are confident, were it not for two legal constraints, that it would grow as plaintiffs become more adept at fashioning their pleadings.  However, "complete preemption . . . functions as an exception to the well-pleaded complaint rule."  *Giles v. NYLCare Health Plans*, *Inc*., 172 F.3d 332, 336 (5th Cir. 1999).  Thus, federal courts are free to entertain discovery to ascertain, for jurisdictional purposes, the facts underlying the complaint.  *See United Surgical Assistants, LLC v. Aetna Life Ins. Co.*, 2014 WL 4059889, at *1 (M.D. Fla. Aug. 14, 2014) (allowing jurisdictional discovery on whether plaintiff's claim was completely preempted by ERISA).

**B.**     **Fourth Amendment to the Secretary's Declaration Supports the *Grable* Doctrine**

In addition to complete preemption as the basis for article III jurisdiction and removal, the Court recognized a separate doctrine in *Grable & Sons Metal Products, Inc. v. Darue Engineering & Mfg*., 545 U.S. 308 (2005).  Under *Grable*, even in the absence of a claim arising under federal law, "a federal court ought to be able to hear claims recognized under state law that nonetheless turn on substantial questions of federal law, and thus justify resort to the experience, solicitude, and hope of uniformity that a federal forum offers on federal issues." *Grable & Sons Metal Products, Inc. v. Darue Engineering & Mfg*., 545 U.S. 308, 312 (2005) (emphasis supplied).  Thus, a substantial federal question is implicated, for example, where "the

interpretation of a federal statute [ ] actually is in dispute in the litigation and is so important that it sensibly belongs in federal court." 545 U.S. at 315. Here, ordaining the metes and bounds of PREP Act protection in the context of a national health emergency necessarily means that the case belongs in federal court. The Secretary, in his Fourth Amendment to his PREP Declaration, similarly concluded, when he stated that

> [t]here are substantial federal legal and policy issues, and substantial federal legal and policy interests within the meaning of *Grable & Sons Metal Products, Inc. v. Darue Eng'g. & Mf'g*., 545 U.S. 308 (2005), in having a unified, whole-of-nation response to the COVID–19 pandemic among federal, state, local, and private-sector entities.

85 Fed. Reg. at 79,197 (col. c).

*See also* 42 U.S.C. § 247d-6d(b)(7) ("No court of the United States, or of any State, shall have subject matter jurisdiction to review, whether by mandamus or otherwise, any action by the Secretary under this subsection."). As such, the secretarial determination provides the underlying basis for invoking the *Grable* doctrine with respect to all claims for loss caused by, arising out of, relating to, or resulting from the administration to or the use by an individual of a covered countermeasure. Once invoked, the court retains the case to decide whether the immunity and preemption provisions apply; if they do not apply, then the court would try the case as it would a diversity case. If the court finds, though, that the PREP Act applies, it would dismiss the case or if death or serious physical injury proximately caused by willful misconduct is alleged, transfer it to the District Court for the District of Columbia. *See* 42 U.S.C. § 247d-6d(d)-(e).

## II.      Limitations

This Advisory Opinion may be supplemented or modified. It is intended to minimize the need for individual advisory opinions. This Advisory Opinion sets forth the current views of the Office of the General Counsel.[3] It is not a final agency action or a final order. It does not have the force or effect of law.

*Robert P. Charrow*

Robert P. Charrow
General Counsel
January 8, 2021

---

[3]      *See Air Brake Sys., Inc. v. Mineta*, 357 F.3d 632, 647–48 (6th Cir. 2004) (holding that the Chief Counsel of the National Highway Traffic Safety Administration had delegated authority to issue advisory opinions to regulated entities in fulfillment of a congressional directive to promote regulatory compliance); 5 U.S.C. § 301 ("The head of an executive department . . . may prescribe regulations for the government of his department, the conduct of its employees, [and] the distribution and performance of its business[.]"); *Statement of Organization, Functions, and Delegations of Authority*, 85 Fed. Reg. 54,581, 54,583 (Sept. 2, 2020).

# EXHIBIT E

Electronically FILED by Superior Court of California, County of Los Angeles on 07/06/2021 12:00 AM Sherri R. Carter, Executive Officer/Clerk of Court, by J. Salazar-Menjivar,Deputy Clerk

Case 2:21-cv-06106   Document 1   Filed 07/28/21   Page 61 of 62   Page ID #:61

**POS-010**

| ATTORNEY OR PARTY WITHOUT ATTORNEY:<br>Allen R. Oghassabian, Esq.   (292653)<br>THE BARNES FIRM, LC<br>655 W. Broadway<br>Suite 940<br>San Diego, CA 92101<br><br>  TELEPHONE NO.: (800) 800-0000     FAX NO.: (888) 800-7050<br>  ATTORNEY FOR: Plaintiff | FOR COURT USE ONLY |
|---|---|

| LOS ANGELES COUNTY SUPERIOR COURT, COUNTY OF LOS ANGELES |
|---|
|   STREET ADDRESS: 111 North Hill Street, Los Angeles<br>  MAILING ADDRESS: 111 North Hill Street, Los Angeles<br>  CITY AND ZIP CODE: CA, 90012<br>  BRANCH NAME: Main |

| PLAINTIFF: Eric Holloway, et al<br>DEFENDANT: Centinela Skilled Nursing & Wellness Centre West,<br>           et al | CASE NUMBER:<br>21STCV17868 |
|---|---|

| PROOF OF SERVICE OF SUMMONS | Ref. No. or File No.:<br>20-00750-CA |
|---|---|

*(Separate proof of service is required for each party served.)*

1.  At the time of service I was at least 18 years of age and not a party to this action.
2.  I served copies of:
    a. [X] summons
    b. [X] complaint
    c. [ ] Alternative Dispute Resolution (ADR) package
    d. [X] Civil Case Cover Sheet (served in complex cases only)
    e. [ ] cross-complaint
    f. [X] other (specify documents):
        Notice Of Case Assignment; Standing Order, Clerk's Certificate Of Mailing; Declaration Of Shalimah Abdullah As
        Successor In Interest To Eric Holloway To Maintain Action Pursuant To Code Of Civil Procedure 377.32

3.  a. Party served *(specify name of party as shown on documents served)*:
       BRIUS MANAGEMENT CO., a California Company

    b. [X] Person (other than the party in item 3a) served on behalf of an entity or as an authorized agent (and not a person
           under item 5b on whom substituted service was made)
       Brittany Carpio / Authorized To Accept Service Of Process

4.  Address where the party was served:
       3580 WIlshire Boulevard, Suite 600, Los Angeles, CA 90010

5.  I served the party *(check proper box)*
    a. [X] by personal service. I personally delivered the documents listed in item 2 to the party or person authorized to
           receive service of process for the party (1) on *(date)*:06/28/2021  (2) at *(time)*:12:15 PM
           Description: Age: 30s, Sex: F, Race/Skin Color: White, Height: 5'6", Weight: 150, Hair: Black, Glasses: Y

    b. [ ] by substituted service. On *(date)*:              at *(time)*:              I left the documents listed in item 2 with
           or in the presence of *(name and title or relationship to person indicated in item 3)*:

       (1) [ ] **(business)** a person at least 18 years of age apparently in charge at the office or usual place of
                business of the person to be served. I informed him or her of the general nature of the papers.
       (2) [ ] **(home)** a competent member of the household (at least 18 years of age) at the dwelling house or usual
                place of abode of the party. I informed him or her of the general nature of the papers.
       (3) [ ] **(physical address unknown)** a person at least 18 years of age apparently in charge at the usual
                mailing address of the person to be served, other than a United States Postal Service post office box. I
                informed him or her of the general nature of the papers.
       (4) [ ] I thereafter mailed (by first-class, postage prepaid) copies of the documents to the person to be served
                at the place where copies were left (Code Civ. Proc., 415.20). I mailed the documents on

Page 1 of 2

**PROOF OF SERVICE OF SUMMONS**        Job Number AYB-2021001188

Electronically FILED by Superior Court of California, County of Los Angeles on 07/06/2021 12:00 AM Sherri R. Carter, Executive Officer/Clerk of Court, by J. Salazar-Menjivar,Deputy Clerk

Case 2:21-cv-06106   Document 1   Filed 07/28/21   Page 62 of 62   Page ID #:62

**POS-010**

| ATTORNEY OR PARTY WITHOUT ATTORNEY:<br>Allen R. Oghassabian, Esq.  (292653)<br>THE BARNES FIRM, LC<br>655 W. Broadway<br>Suite 940<br>San Diego, CA 92101<br><br>  TELEPHONE NO.: (800) 800-0000     FAX NO.: (888) 800-7050<br>  ATTORNEY FOR: Plaintiff | *FOR COURT USE ONLY* |
|---|---|

| LOS ANGELES COUNTY SUPERIOR COURT, COUNTY OF LOS ANGELES<br>  STREET ADDRESS: 111 North Hill Street, Los Angeles<br>  MAILING ADDRESS: 111 North Hill Street, Los Angeles<br>  CITY AND ZIP CODE: CA, 90012<br>  BRANCH NAME: Main |
|---|

| PLAINTIFF: Eric Holloway, et al<br>DEFENDANT: Centinela Skilled Nursing & Wellness Centre West,<br>        et al | CASE NUMBER:<br>21STCV17868 |
|---|---|

| **PROOF OF SERVICE OF SUMMONS** | Ref. No. or File No.:<br>20-00750-CA |
|---|---|

*(Separate proof of service is required for each party served.)*

1. At the time of service I was at least 18 years of age and not a party to this action.
2. I served copies of:
   - a. [X] summons
   - b. [X] complaint
   - c. [ ] Alternative Dispute Resolution (ADR) package
   - d. [X] Civil Case Cover Sheet (served in complex cases only)
   - e. [ ] cross-complaint
   - f. [X] other (specify documents):
     Notice Of Case Assignment; Standing Order, Clerk's Certificate Of Mailing; Declaration Of Shalimah Abdullah As Successor In Interest To Eric Holloway To Maintain Action Pursuant To Code Of Civil Procedure 377.32

3. a. Party served *(specify name of party as shown on documents served)*:
      CENTINELA SKILLED NURSING & WELLNESS CENTRE WEST, LLC dba CENTINELA SKILLED NURSING & WELLNESS CENTRE WEST, a California Skilled Nursing Facility
   b. [X] Person (other than the party in item 3a) served on behalf of an entity or as an authorized agent (and not a person under item 5b on whom substituted service was made)
      Brittany Carpio / Authorized To Accept Service Of Process

4. Address where the party was served:
   3580 WIlshire Boulevard, Suite 600, Los Angeles, CA 90010

5. I served the party *(check proper box)*
   a. [X] by personal service. I personally delivered the documents listed in item 2 to the party or person authorized to receive service of process for the party (1) on *(date):*06/28/2021  (2) at *(time):*12:15 PM
      Description: Age: 30s, Sex: F, Race/Skin Color: White, Height: 5'6", Weight: 150, Hair: Black, Glasses: Y

   b. [ ] by substituted service. On *(date):*              at *(time):*        I left the documents listed in item 2 with or in the presence of *(name and title or relationship to person indicated in item 3)*:
      - (1) [ ] **(business)** a person at least 18 years of age apparently in charge at the office or usual place of business of the person to be served. I informed him or her of the general nature of the papers.
      - (2) [ ] **(home)** a competent member of the household (at least 18 years of age) at the dwelling house or usual place of abode of the party. I informed him or her of the general nature of the papers.
      - (3) [ ] **(physical address unknown)** a person at least 18 years of age apparently in charge at the usual mailing address of the person to be served, other than a United States Postal Service post office box. I informed him or her of the general nature of the papers.
      - (4) [ ] I thereafter mailed (by first-class, postage prepaid) copies of the documents to the person to be served